NO. 07-05-00188-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

JUNE 20, 2007
_____

YORKSHIRE INSURANCE CO., LTD., AND
OCEAN MARINE INSURANCE CO., LTD., APPELLANTS

V.

ROY SEGER, INDIVIDUALLY AND SHIRLEY FAYE HOSKINS,
INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF
RANDALL JAY SEGER, DECEASED, AND ALL AS ASSIGNEES OF
DIATOM DRILLING CO., A TEXAS LIMITED PARTNERSHIP, APPELLEES
_____

FROM THE 84TH DISTRICT COURT OF HUTCHINSON COUNTY;

NO. 33,355; HONORABLE JOHN LAGRONE, JUDGE
_____

Before QUINN, C.J., and HANCOCK, J., and BOYD, S.J.[1]


**OPINION**


We grant the Segers' motion for rehearing. We withdraw our opinion of April 30, 2007, and substitute the following in its place.

Appellants, Yorkshire Insurance Co., Ltd., and Ocean Marine Insurance Co., Ltd., appeal a judgment entered against them awarding $26,732,876.71 in actual damages,

_____

[1] John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

$10,041,307.94 in pre-judgment interest, post-judgment interest at the rate of five percent per annum from the January 3, 2005 date of judgment, and costs, to appellees, Roy Seger and Shirley Faye Hoskins, individually and as administrator of the estate of Randall Jay Seger (collectively, "the Segers"). We affirm in part and reverse and remand for further proceedings.

Because of the complexity of the issues presented on appeal, we will outline the facts and circumstances leading to this appeal and identify other pertinent facts in our discussion of the specific issues presented.

## Background

This is an appeal of a <u>Stowers</u>[2] action. The underlying incident giving rise to this action was the death of Randall Jay Seger. Randall did drilling work for two related companies, Diatom Drilling Co., L.P. (Diatom), and Employer's Contractor Services, Inc. (ECS). ECS was a corporation established by Diatom's general partner, Cynthia Gillman, to provide oil field services to Diatom and other drilling contractors. On July 13, 1992, while employed by ECS but providing services to Diatom, Randall was killed when a Diatom rig he was working on collapsed. Diatom, who was insured by a Lloyd's of London-type comprehensive general liability (CGL) insurance policy at the time of the accident, notified the subscribing insurers (collectively, "the CGL insurers") of the accident. Yorkshire and Ocean Marine (collectively, "Insurers") were members of this group.

---

[2] See generally G.A. Stowers Furniture Co. v. Am. Indem. Co., 15 S.W.2d 544, 548 (Tex.Comm'nApp. 1929, holding approved).

In June of 1993, Randall's parents, the Segers, filed suit against Diatom, its partners, and ECS alleging negligence and gross negligence. The CGL insurers were not specifically notified of the suit at the time that it was filed. The suit sat virtually dormant until 1998. In 1998, Diatom demanded that the CGL insurers provide a defense to the Segers' suit. The CGL insurers refused to provide a defense, contending that Randall's death was not a covered occurrence and that Diatom failed to provide timely notice of suit.

After the CGL insurers refused to provide Diatom a defense, the Segers offered to settle their suit against Diatom for $500,000, the policy limits of the CGL policy. Diatom made demand on the CGL insurers to settle the claim based on this offer. The CGL insurers notified Diatom that two of the insurers had become insolvent and, therefore, the demand exceeded the available policy limits of the CGL policy. Based on this additional information, the Segers offered to settle the suit for $368,190, the policy limits available from the solvent CGL insurers. The Segers subsequently lowered their settlement offer to $250,000. The CGL insurers refused each of these settlement demands.

Prior to trial in the underlying lawsuit, the Segers non-suited Gillman, and Diatom's counsel withdrew from representation. On March 27, 2001, the underlying suit was tried. Gillman was subpoenaed to attend and did attend as a witness. Gillman testified that she was appearing as the *pro se* representative of Diatom. However, the record reflects that Gillman's participation in the proceeding was consistent with that of a witness rather than a party. Gillman's limited "representation" of Diatom is evidenced by the fact that Diatom was not represented by counsel, presented no opening or closing argument, called no witnesses and presented no evidence. Gillman testified and, at the conclusion of her

3

testimony, was dismissed. As a result of this trial, the trial court entered judgment against Diatom and awarded the Segers $15,000,000, plus pre- and post-judgment interest.

Following the entry of judgment in the underlying suit, Gillman contacted Diatom's CGL insurers to inquire what they intended to do about the judgment. When Gillman received no response to her inquiry, she assigned Diatom's rights against the CGL insurers to the Segers. The assignment reserved Diatom's right to recover its attorney's fees incurred in defense of the underlying suit, but otherwise assigned all of Diatom's rights against the CGL insurers to the Segers. Following the assignment, the Segers filed suit against the CGL insurers seeking damages based on the insurers' wrongful refusal to defend Diatom and negligent failure to settle the Segers' claim when demand was made within policy limits.

Prior to trial on the Stowers action, the Segers settled their assigned claims against all of the remaining solvent CGL insurers, except Yorkshire and Ocean Marine, and the settling insurers were dismissed from the suit. As the Stowers litigation against Insurers moved toward trial, both the Segers and Insurers filed multiple motions for summary judgment. The trial court heard these motions, denied all of Insurers' motions, and granted the Segers' motion for partial summary judgment on the issues of "coverage, demand within limits, fully adversarial relationship, and trial." Because each of these issues were resolved prior to trial, the only issues at the Stowers trial were the determination of Insurers' negligence, causation, and damages. During the trial, the trial court directed the verdict as to damages based on the judgment the Segers obtained against Diatom in the

4

underlying suit. The issues of negligence and causation were submitted to a jury. The jury returned a verdict in favor of the Segers.

Insurers appeal the trial court's rulings on certain procedural issues, the competing motions for summary judgment, the denial of Insurers' motion for directed verdict, and the granting of the Segers' motion for directed verdict on damages. Insurers present six issues on appeal. Identifying these issues in the order that they will be addressed, Insurers contend that (1) the trial court erred in striking Insurers' defenses for violations of the Insurance Code, (2) Randy's death was not covered by the CGL policy because of the "leased-in worker" exclusion contained in the policy, (3) the Segers failed to make a settlement demand within Insurers' several policy limits, (4) the Segers failed to conclusively establish their damages, (5) evidence of collusion between Diatom and the Segers was improperly concealed, and (6) the trial court judge should have recused himself and the Segers' trial counsel should have been disqualified.

Summary Judgment Issues

Three of Insurers' issues relate to matters that were decided by the trial court by summary judgment. These issues are the statutory preclusion of Insurers' contract defenses, coverage, and demand within limits.[3] Each of these rulings will be reviewed using the same standard of review.

---

[3] We note that the trial court also entered summary judgment regarding issues related to damages, but, as the damages issue was ultimately decided by directed verdict, we will address it separately.

5

A. Standard of Review

When both parties to a suit move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. City of Garland v. Dallas Morning News, 22 S.W.3d 351, 356 (Tex. 2000). When the trial court grants one party summary judgment and denies the other, we review both parties' summary judgment evidence, determine all questions presented, and render the judgment the trial judge should have rendered. FM Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000). When the trial court does not specify the basis on which it granted summary judgment, the judgment will be affirmed on any meritorious ground expressly presented in the motion and which is preserved for appellate review. State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 380 (Tex. 1993).

Both parties moved for summary judgment on traditional and no-evidence grounds. See TEX. R. CIV. P. 166a. We review a summary judgment *de novo* to determine whether the prevailing party has established its right to summary judgment as a matter of law. See Dallas Cent. Appraisal Dist. v. Cunningham, 161 S.W.3d 293, 295 (Tex.App.–Dallas 2005, no pet.). In reviewing a summary judgment, we must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. See City of Keller v. Wilson, 168 S.W.3d 802, 824-25 (Tex. 2005).

B. Global Preclusion of Insurers' Contract-Based Defenses

In 1992, Insurance Code article 1.14-1, section 8, provided, "Except for lawfully procured surplus lines insurance . . . any contract of insurance effective in this state and entered into by an unauthorized insurer is unenforceable by such insurer." See Act of Apr. 27, 1967, 60th Leg., R.S., ch. 185, § 1, 1967 Tex. Gen. Laws 400, 401, amended by, Act of May 27, 1993, 73rd Leg., R.S., ch. 999, § 3, 1993 Tex. Gen. Laws 4373, 4374, repealed by, Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538 (current version at TEX. INS. CODE ANN. § 101.201 (Vernon Supp. 2006)[4]).[5] In 1993, this section was amended and the language of the exception was changed from "lawfully procured surplus lines insurance" to "insurance procured by a licensed surplus lines agent from an eligible surplus lines insurer." However, under both the former and amended versions of article 1.14-1, section 8, whether the exception applied to a particular transaction was determined by reference to the requirements for "Surplus Lines Insurance," contained in article 1.14-2. See Act of Apr. 27, 1967, 60th Leg., R.S., § 1, 1967 Tex. Gen. Laws 400, 408-14, amended by, Act of May 27, 1993, 1993, 73rd Leg., R.S., ch. 999, § 16, 1993 Tex. Gen. Laws 4373, 4376-81, repealed by, Act of May 22, 2003, 78th

---

[4] Further reference to current provisions of the Insurance Code will be by reference to "section __" or "§ __."

[5] Further citation to the pre-amendment version of article 1.14-1 will be by reference to "former article 1.14-1, § __." Further citation to the post-amendment version of article 1.14-1 will be by reference to "amended article 1.14-1, § __."

Leg., R.S., ch. 1274, § 26, 2003 Tex. Gen. Laws 3611, 4138 (current version at § 981.001-.222).[6]

The Segers contend that Insurers cannot enforce any defenses derived from the CGL policy, as a matter of law, because Insurers were unauthorized insurers when the policy was issued. Insurers contend that, even though they were and are unauthorized insurers, the statute does not preclude an unauthorized insurer's reliance on contract-based defenses in suits initiated by the insured[7] or, if the statute does preclude an unauthorized insurer from asserting its contract-based defenses, the preclusion is inapplicable to Insurers because they met the surplus lines insurance exception.

Initially, because the surplus lines exception changed with the 1993 amendments, we must determine the law applicable to the current case. The Segers contend that, because the policy at issue was entered into in 1992, the laws existing at the time the contract was made became part of the contract and govern the transaction. Insurers contend that the 1993 amendments were procedural or remedial in nature and, therefore, are properly applied retroactively. Courts generally presume that an amendment to a statute is to be applied prospectively and not retroactively. Subaru of Am., Inc. v. David

---

[6] Further citation to the pre-amendment version of article 1.14-2 will be by reference to "former article 1.14-2, § __." Further citation to the post-amendment version of article 1.14-2 will be by reference to "amended article 1.14-2, § __."

[7] Recently, the Texas Supreme Court clarified that the effect of the post-amendment provisions applicable to this case is to preclude unauthorized insurers from enforcing its policies. See Lexington Ins. Co. v. Strayhorn, 209 S.W.3d 83, 89 (Tex. 2006). Thus, we conclude that the Texas Supreme Court has specifically rejected Insurers' contention that the applicable provisions do no more than preclude an unauthorized insurer from bringing suit.

McDavid Nissan, Inc., 84 S.W.3d 212, 219 (Tex. 2002). However, this general rule does not apply when the amendment is procedural or remedial, unless the retroactive application of the amendment would affect a party's vested rights. Id. at 219-20.

The 1993 amendments to articles 1.14-1 and 1.14-2 were intended to provide "reasonable and practical safeguards" to protect Texas consumers. Amended article 1.14-2, § 1. An unauthorized insurer who issues a policy to a Texas consumer is penalized by, among other things, being precluded from enforcing any defenses contained within the unauthorized policy. See amended article 1.14-1, § 9; Lexington Ins. Co., 209 S.W.3d at 89. However, because surplus lines insurance is sometimes necessary to insure risks for which coverage cannot be obtained from a licensed, resident insurer, see amended article 1.14-2, § 1; Mid-Am. Indem. Ins. Co. v. King, 22 S.W.3d 321, 322 (Tex. 1995), unauthorized insurers may become "eligible" to issue surplus lines policies to Texas consumers, provided that the insurer complies with strict capitalization and registration requirements. See amended article 1.14-1, § 8; amended article 1.14-2, § 3; Mid-Am. Indem. Ins. Co., 22 S.W.3d at 323. As these surplus lines insurers remain unauthorized insurers, they are subject to the remedial penalties imposed on an unauthorized insurer conducting the business of insurance in the state, including the loss of their contract-based defenses, unless they strictly comply with the eligibility requirements of amended article 1.14-2. See Lexington Ins. Co., 209 S.W.3d at 89. Because the 1993 amendment to article 1.14-1, section 8, affects only the remedies available to an insured when article

9

1.14-2 is violated by the insurer, we hold that the amended versions of these articles apply to the present case.[8]

While the parties and the foregoing analysis cite the former and amended articles 1.14-1 and 1.14-2, these articles were repealed and recodified by the 76th and 78th Legislatures.  See Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538; Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26, 2003 Tex. Gen. Laws 3611, 4138.  However, the Legislature expressly indicated that no substantive change in the law was intended by either Act.  See Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 6, 1999 Tex. Gen. Laws 486, 538 ("This Act is intended as a recodification only, and no substantive change in law is intended by this Act."); Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 27, 2003 Tex. Gen. Laws 3611, 4139 (same).  As a result and based on our determination that the 1993 amendments should be applied retroactively, we will refer to the current codification of the law when possible.

It is undisputed that Insurers were unauthorized insurers at all times relevant to the present case.  Section 101.201(a) provides that, "An insurance contract effective in this

_____

[8] Other Texas courts have likewise applied post-amendment unauthorized and surplus lines insurance provisions retroactively, even when the policies were issued prior to 1993.  See Lexington Ins. Co., 209 S.W.3d at 85, 89-90 (applying post-amendment article 1.14-1, § 11, to case involving insurance tax dispute covering taxes accruing from 1992 through 1995); Mid-Am. Indem. Ins. Co., 22 S.W.3d at 325 (requiring eligibility under post-amendment article 1.14-2 as prerequisite to bond exemption, even though the exemption specifically required eligibility at the time coverage issued, which was prior to 1993 amendments); Wheelways Ins. Co. v. Hodges, 872 S.W.2d 776, 779, 784 n.10 (Tex.App.–Texarkana 1994, no writ) (applying amended article 1.14-1, § 8, to case involving accident occurring in 1989 with suit against insurer filed in 1991).

10

state and entered into by an unauthorized insurer is unenforceable by the insurer."[9] However, the former article 1.14-1, § 8, the amended article 1.14-1, § 8, and the recodified section 101.201(b) provide an exception to this prohibition for surplus lines insurance. The Segers contend that Insurers could produce no evidence that the CGL policy in this case was "lawfully procured surplus lines insurance" or, alternatively, the Segers conclusively established that the CGL policy was not "lawfully procured surplus lines insurance" and, therefore, Insurers are precluded from asserting their contract-based defenses under former article 1.14-1, § 8. Insurers contend that they were entitled to rely on their contract-based defenses because they established that they met the surplus lines exception of amended article 1.14-1, § 8, as a matter of law.

The Segers' motion for summary judgment states that, for an insurer to raise any contractual defense in a suit on the policy, the insurer must prove that it was either authorized to do business in Texas or that the insurance at issue was "lawfully procured surplus lines insurance." The Segers indicate that all references to provisions of the Insurance Code in their motion are references to the version in effect when the coverage was issued in 1992, i.e., the pre-amended versions of articles 1.14-1 and 1.14-2. The Segers then allege that the CGL policy was issued in violation of former article 1.14-2, §§ 2, 5, 6(a), 6(c), 6(d), 6(e), 6A(a6),[10] 7(a), 7(b), and 8. Ultimately, the Segers contend that,

---

[9] The same restriction on the enforcement of unauthorized insurance contracts may be found in both the former and amended law. See amended article 1.14-1, § 8; former article 1.14-1, § 8.

[10] Reference to the pre-amendment version of article 1.14-2, reveals that there was no section 6A. As section 6A was added by the 1993 amendments, but it did no more than authorize the establishment of the Surplus Lines Stamping Office. See amended article

11

because Insurers could present no evidence that they met the "lawfully procured surplus lines insurance" exception or because the Segers had conclusively established that the CGL policy was not "lawfully procured surplus lines insurance," the Segers were entitled to summary judgment precluding Insurers from relying on their contractual defenses as a matter of law.

Because we have already held that the 1993 amendments to articles 1.14-1 and 1.14-2 were procedural or remedial and are to be applied retroactively, any violation of former article 1.14-1 or 1.14-2 are of no effect on Insurers' ability to enforce its contract-based defenses in the policy. As we held above, the pre-amendment law, relied upon by the Segers to support its motion for summary judgment, was rendered ineffective by the 1993 amendments and, as a result, violations of the pre-amendment provisions would not result in a preclusion of Insurers' contract-based defenses. Therefore, we conclude that the Segers' motion failed to expressly present grounds that would entitle the Segers to summary judgment on coverage based on Insurers being precluded from asserting their contract-based defenses. See TEX. R. CIV. P. 166a(c). Further, because the Segers' motion cites ineffective law, we conclude that the Segers' motion failed to state the elements upon which Insurers could produce no evidence relating to Insurers' right to assert its contract-based defenses. See TEX. R. CIV. P. 166a(i). Because the Segers' summary judgment motion presents no grounds upon which the trial court could have granted summary judgment, we conclude that, to the extent the trial court based its grant

---

1.14-2, § 6A.

12

of summary judgment on coverage on the global preclusion of Insurers' contract-based defenses, the trial court erred.

Insurers appeal the denial of their motion for partial summary judgment on coverage. Because surplus lines insurance is excepted from the general statutory restriction on unauthorized insurers, the burden of proving every fact essential to the invocation of the exception rests on Insurers. See Cramer v. Sheppard, 140 Tex. 271, 167 S.W.2d 147, 155 (1942); Risk Managers Int'l, Inc. v. State, 858 S.W.2d 567, 570 (Tex.App.–Austin 1993, writ denied). Thus, for Insurers to be entitled to summary judgment on coverage, Insurers must establish that Insurers were eligible surplus lines insurers and that the CGL policy was procured through a licensed surplus lines agent as a matter of law, see § 101.201(b), and that the Segers' claims are not covered by the CGL policy.

We will initially review the evidence regarding whether Insurers established that they were eligible surplus lines insurers as a matter of law. An "eligible surplus lines insurer" must comply with the requirements of sections 981.051-.065 of the Insurance Code. See § 981.002(1). The record contains a certification from Kathy A. Wilcox, Registration Officer of the Texas Department of Insurance, that indicates, at all times pertinent to the present

13

case, both Yorkshire[11] and Ocean Marine[12] were unlicensed insurers which were eligible to provide surplus lines insurance under each iteration of the statute and at all times pertinent to the present case. We conclude that, because these certifications were uncontroverted, the evidence conclusively established that Insurers were eligible surplus lines insurers.[13]

However, more is required to meet the exception of section 101.201(b). In addition to the insurer being eligible to provide surplus lines insurance, the insurance must be procured through a licensed surplus lines agent. § 101.201(b). The record includes a statement from Matt Ray, Deputy Commissioner of the Licensing Division of the Texas Department of Insurance, indicating that London American Risk Specialists, Inc. (LARSI), held a surplus lines agency license that was issued on February 14, 1984 and was due to expire October 25, 2005, if not timely renewed. Notably, the cover note for the CGL policy specifically indicates that the insurance was placed through LARSI. However, the Segers correctly indicate that this evidence identifies LARSI as holding a license as a managing general agency. Section 981.220(b) restricts a surplus lines agent whose license is granted to it as a managing general agent, that is not also licensed under Article 21.14 of

---

[11] Specifically, the certification provides that Yorkshire was "an unlicensed insurer which is an eligible insurer for providing surplus lines insurance under article 1.14-2, Texas Insurance Code from September 1, 1989 thru November 12, 2001 and from July 1, 2002 thru the present."

[12] Specifically, the certification provides that Ocean Marine was "an unlicensed insurer which is an eligible insurer for providing surplus lines insurance under article 1.14-2, Texas Insurance Code from November 1, 1989 thru the present."

[13] Further, we note that the Segers do not contest Insurers' general eligibility to provide surplus lines insurance.

the Insurance Code,[14] to business that originates through a licensed general property and casualty agent. Thus, for LARSI's surplus lines agent license to meet the exception found in section 101.201(b), the transaction must have been directed through an agent that was a licensed general property and casualty agent. § 981.220(b).

No record evidence establishes that the CGL policy was directed through an agent that was a licensed general property and casualty agent.[15] As such, Insurers have failed to prove every fact essential to the invocation of the section 101.201(b) surplus lines insurance exception and the trial court did not err in overruling Insurers' partial summary judgment motion on coverage. See Cramer, 167 S.W.2d at 155; Risk Managers Int'l, Inc., 858 S.W.2d at 570. We affirm the trial court's denial of Insurers' partial summary judgment on the issue of coverage.

## C. Coverage

While we have held that the trial court erred in granting the Segers summary judgment on the issue of coverage to the extent that summary judgment was based on the preclusion of Insurers' contract-based defenses, because the trial court did not specify the grounds upon which it granted summary judgment on the issue of coverage, we must affirm the judgment if it is supported by any meritorious ground expressly presented in the motion and preserved for appellate review. S.S., 858 S.W.2d at 380. In their motion for

---

[14] Relating to local recording agent licenses.

[15] We note that evidence was offered relating to this issue by Insurers, but this evidence was objected to by the Segers, the objection was sustained by the trial court, and Insurers failed to challenge the trial court's ruling on appeal.

summary judgment, the Segers alternatively contended that Insurers could produce no evidence to support any of the contract-based defenses they alleged and, *inter alia*, contended that the "Excluding Leased-In Employees/Workers" language does not exclude the Segers' claims from coverage as a matter of law.[16]  As such, a determination that Insurers failed to present more than a scintilla of evidence of any of the defenses alleged or that the Segers affirmatively negated each defense would require affirmation of the trial court's summary judgment on the issue of coverage.[17]

The CGL policy includes, in its cover note, an exclusion of "Leased-In Employees/Workers."  This phrase is not defined by the policy.  Insurers contend that a standard "leased worker" exclusion was not included in the policy because a standard "leased worker" exclusion was not established until 1993. Of note, the policy does include a standard employee exclusion.  The employee exclusion specifically excludes any liability for claims asserted by, or on behalf of, Diatom/ECS employees from coverage under the policy.  Insurers contend that either Randall was actually an employee of Diatom and, therefore, the Segers' claim is excluded by the standard employee exclusion or Randall

---

[16] By their appeal, Insurers urge error only in regard to the leased-in worker exclusionary defense to coverage.  Thus, any objection to any other contractual defense has been inadequately briefed and is waived.  See Knie v. Piskun, 23 S.W.3d 455, 460 (Tex.App.–Amarillo 2000, pet. denied); Lewis v. Deaf Smith Elec. Co-op., Inc., 768 S.W.2d 511, 512-13 (Tex.App.–Amarillo 1989, no writ.).

[17] As we have previously determined that Insurers have failed to establish their right to assert their contract-based defenses, Insurers would not be entitled to summary judgment on coverage, even if they established that a contractual provision excluded coverage as a matter of law.  See TEX. R. APP. P. 47.1.

was "leased in" by Diatom from ECS and coverage is excluded based on the leased-in worker exclusion contained on the CGL cover note.

The Segers claims are for bodily injury to Randall. The CGL policy generally covers claims for bodily injury or property damage. Thus, there is no dispute that the CGL policy generally covers the kind of claims alleged by the Segers. However, the parties hotly contest the application of the leased-in worker/employee exclusion to the Segers' claim. Once general coverage is established, the burden of proving the existence and applicability of a policy exclusion rests with Insurers. TEX. R. CIV. P. 94; Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co., 130 S.W.3d 181, 193 (Tex.App.–Houston [14th Dist.] 2003, pet. denied); Venture Encoding Serv., Inc. v. Atl. Mut. Ins. Co., 107 S.W.3d 729, 733 (Tex.App.–Fort Worth 2003, pet. denied).

The interpretation of insurance policies is governed by the same rules of construction applicable to other written contracts. State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 433 (Tex. 1995). In construing a written contract, the court's primary concern is to ascertain the true intentions of the parties as expressed in the instrument. Id.; Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). Terms in an insurance contract will be given their ordinary meaning unless the policy shows that the words were meant in a technical or different sense. Sec. Mut. Cas. Co. v. Johnson, 584 S.W.2d 703, 704 (Tex. 1979). We must read all parts of the contract together and must strive to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative. Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 741 (Tex. 1998). If, after applying these rules

17

of construction, an insurance policy remains ambiguous, we are to construe the language in a manner that favors coverage. Beaston, 907 S.W.2d at 433.

Looking to the CGL policy, the phrase "Leased-In Employees/Workers" is not defined anywhere in the policy. No standard leased worker exclusion is included in the policy. Reading all of the parts of the policy reveals that every exclusion in the contract excludes coverage for claims of insureds' liability related to or arising from the event or persons identified by the various exclusions. The ordinary meaning of "lease" is an agreement for possession or use of property for a specified period or at will in exchange for a specified rent or compensation. See MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 798 (Frederick C. Mish, ed., 11th ed. 2003); BLACK'S LAW DICTIONARY 898 (7th ed. 1999). The ordinary meaning of "worker" is a person that "exerts strength or faculties to do or perform something." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1442-43 (Frederick C. Mish, ed., 11th ed. 2003). The ordinary meaning of the word "in," when used as a modifier, is directed toward some destination or place. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 627 (Frederick C. Mish, ed., 11th ed. 2003). Therefore, we conclude that, applying the ordinary meaning to the words used in the CGL policy and striving to give meaning to every part thereof, the condition "Excluding Leased-In Employees/Workers," as a matter of law, unambiguously excludes from coverage all claims for a named insured's liability for bodily injury or property damage brought by or on behalf of persons that perform work for the

18

insured under an agreement with another allowing temporary use of the worker, even though the leased worker would not be an employee of insured.[18]

Looking to the testimony of Cynthia Gillman at the underlying Seger v. Diatom trial, Gillman testified that ECS had a Contract for Personnel Services with Diatom by which ECS would supply workers to perform work in fulfillment of Diatom's drilling contracts. Gillman testified that Randall Seger was an employee of ECS that was doing work at the Diatom drilling site at the time of his death. Considering this evidence in the light most favorable to Insurers and indulging all reasonable inferences in their favor, we conclude that there is more than a scintilla of evidence that the Segers' claims were excluded by the CGL policy. Further, we cannot say that the Segers have negated the applicability of the CGL policy's "Excluding Leased-In Employees/Workers" condition as a matter of law. Therefore, we conclude that the trial court erred in granting the Segers summary judgment on the issue of coverage.

The Segers contend that the leased-in worker exclusion is ambiguous because the exclusion could reasonably be construed to exclude leased-in workers from being "insureds" under the policy, claims made by leased-in workers, or all claims, including wrongful death claims asserted by survivors of the leased-in worker, arising from the leased-in worker relationship. However, as indicated above, when the CGL policy's provisions are read together, we conclude that the exclusion excludes from coverage all

---

[18] We focus on the term "worker" in an effort to harmonize the provisions of the policy. Claims for bodily injury by a leased-in worker that concurrently holds the status of an employee would be covered under the standard employee exclusion contained in the CGL policy. Thus, an exclusion for a leased-in employee would be redundant.

claims for a named insured's liability for bodily injury or property damage brought by or on behalf of persons that perform work for the insured under an agreement with another allowing the temporary use of the worker. Thus, our construction of this condition excludes coverage for all claims for bodily injury or property damage whether brought by or on behalf of leased-in workers. We do not find the Segers' interpretation of the condition as excluding leased-in workers from being "insureds" reasonable, since the CGL policy specifically identifies those parties, Diatom and ECS, that were "insureds" and would not need to specifically identify others as not being "insureds."[19]

Having concluded that the trial court erred in granting summary judgment on the issue of coverage, we reverse that portion of the summary judgment. We affirm the trial court's denial of Insurer's motion for summary judgment on the issue of coverage.

D. Demand Within Limits

To prove an insurer's negligent failure to settle a claim, i.e., a Stowers claim, the insured must establish that (1) the claim is within the scope of coverage, (2) a demand was made that was within policy limits, and (3) the demand was such that an ordinary prudent insurer would have accepted it, considering the likelihood and degree of the insured's potential exposure to an excess judgment. Am. Physicians Ins. Exch. v. Garcia, 876 S.W.2d 842, 849 (Tex. 1994). A demand that exceeds the policy limits, even though

---

[19] We note that the Segers' present no alternative interpretation of the phrase "leased-in employee/worker." Other than the interpretation identified in this opinion, we can identify no other reasonable interpretation of this phrase and, therefore, conclude that the phrase is unambiguous.

20

reasonable, does not trigger the insurer's duty to settle. Id. Insurers contend that, since the policy provided that each insurer was severally liable, the Segers' collective settlement offers were ineffective to trigger Insurers' Stowers liability because the Segers failed to make settlement demands within the several limits of Yorkshire and Ocean Marine. The Segers contend that their collective settlement demands were within the solvent policy limits available under the CGL policy and were sufficient to meet the second Stowers element. Further, the Segers rely on the CGL insurers' admission that the Segers made a demand that was within the available policy limits.

The terms of the CGL policy provided that, in exchange for premium payments totaling $10,850,[20] the CGL insurers would provide coverage for the period of January 23, 1992 through January 23, 1993, with policy limits of $500,000 per accident/occurrence. The cover note, which was incorporated into the policy, indicated that Yorkshire insured 16.472 percent of the policy and that Ocean Marine insured 10 percent of the policy. It is undisputed that the Segers did not make demands upon Yorkshire and Ocean Marine separately that would fall within their proportionate share of the policy's limits. However, it is also undisputed that the Segers did make demand for the stated policy limits, $500,000, and subsequently made demands for $368,190 and $250,000. In fact, at Insurers' request, the trial court took judicial notice that the Segers offered to settle the underlying case for $250,000. Thus, the facts related to this issue are not in dispute. Rather, the question presented is whether the Segers' collective settlement demand for $250,000 was sufficient to meet the "demand within policy limits" element of a Stowers

---

[20] No issue has been raised regarding the timely payment of these premiums.

21

action or were the Segers required to make separate demands upon each of the CGL insurers within each insurer's proportionate share of the policy's limits.

In a typical Stowers action, an insured brings suit against his insurer for the insurer's negligent failure to settle a covered claim asserted against the insured for an amount within the applicable policy limits when the covered claim results in a judgment in excess of the policy limits. However, before an insured can prevail in a Stowers action, the claimant in the underlying proceeding must have made a settlement demand that was within the applicable policy limits. Id. Thus, it is the claimant in the underlying suit that determines whether the second element of a Stowers claim can be met by the insured. As a result, we believe that a claimant should be entitled to rely on the specific provisions of an insurance policy in making a settlement demand that is within the coverage of the policy. That it is the policy that dictates whether a settlement demand was within policy limits is bolstered by the Texas Supreme Court's indication that a settlement demand that proposes to release the insured for "the policy limits," in lieu of a demand for a sum certain, is sufficient to satisfy the "demand within limits" element of a Stowers action. See Id. at 848-49. Further, when a claimant makes such a demand and it is rejected by the insurer, we believe that proof that a settlement demand that was within the limits stated in the policy and that was rejected by the insurer is all that is necessary to satisfy the "demand within limits" element of a Stowers claim. Thus, in the present case, we conclude that the Segers' collective settlement demand of $250,000, which falls within the $500,000 limit stated in the policy, was sufficient to satisfy the second element of a Stowers action against

22

Insurers.[21]  As the undisputed facts establish that the Segers made a settlement demand that was within the CGL policy limits as a matter of law, we affirm the trial court's grant of summary judgment in favor of the Segers on this issue.

## Damages

Insurers contend that the Segers presented no evidence to establish that Diatom suffered injury as a result of any negligence on the part of Insurers and, therefore, the trial court's grant of directed verdict as to damages was in error.  Insurers contend that (1) Diatom was judgment proof and, therefore, was not injured by Insurers' negligence, (2) directed verdict was an improper method to determine damages, and (3) because the underlying judgment was not the result of a fully adversarial trial, it constituted no evidence of damages.  The Segers contend that Diatom's financial condition is immaterial to Insurers' Stowers liability and that, because the damages awarded in the underlying judgment were the result of a fully adversarial trial, the damages awarded in that judgment are conclusive of the damages Diatom suffered as a result of Insurers' negligence. We will address each of Insurers' subpoints regarding this issue in the order in which they were presented.

---

[21] We express no opinion regarding what, if any, effect the insolvency of certain severally liable insurers would have on whether a demand within stated policy limits, but exceeding the solvent insurers' proportionate share of coverage, would have on the establishment of a "demand within limits" in the context of a subsequent Stowers action. In the present case, it is undisputed that, when the Segers made their $250,000 demand, the demand was within the available policy limits of the solvent CGL insurers.

23

In reviewing the granting of a no-evidence summary judgment, we must decide whether any probative evidence was presented that would raise a genuine issue of material fact regarding the issue upon which the summary judgment was granted. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241-42 (Tex. 2001) (per curiam). This is the same standard utilized in reviewing a directed verdict. See King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 750-51 (Tex. 2003). In determining if the evidence raises a genuine issue of material fact, we review the evidence in the light most favorable to the party against whom the verdict is rendered. Morgan v. Anthony, 27 S.W.3d 928, 929 (Tex. 2000).

Insurers contend that, because Diatom was unable to pay any damages awarded by the judgment, the Segers cannot prove that Diatom suffered any harm as a result of Insurers' negligent refusal to settle the Segers' claims when demand was made within policy limits. The record does establish that Diatom is and was judgment proof. Diatom ceased doing business in 1993, sold all of its assets to make payments to creditors, and was involuntarily dissolved. As a result, Diatom possessed no assets from which it could pay any damages awarded to the Segers.

Insurers' contention is analogous to the argument made by the insurer in YMCA of Metro. Fort Worth v. Commercial Standard Ins. Co., 552 S.W.2d 497 (Tex.Civ.App.–Fort Worth 1977, writ ref'd n.r.e.). In YMCA, the insurer argued that, because its insured had entered into a covenant with the plaintiffs not to execute the judgment against the insured, the insured had no obligation to pay the judgment and, consequently, was not harmed by the insurer's negligent refusal to settle. Id. at 501. The court analyzed the language in the policy at issue and concluded that the policy was a liability policy rather than an indemnity

24

policy. Id. at 504. Notably, the court cited the policy's provision that, "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . ." After discussing the differences between a liability policy and an indemnity policy,[22] the court concluded that the policy was a liability policy and that the covenant not to execute did not release the insurer from liability, even though the insured was under no legal obligation to pay the damages awarded. See id.

The CGL insurance policy involved in the present case includes the exact language cited above in the YMCA policy. From this and other provisions of the policy, we conclude that the CGL policy is a liability policy rather than an indemnity policy. Therefore, we conclude that Diatom's inability to pay the damages awarded in the underlying judgment does not affect Diatom's liability under the judgment. See id. at 504. Thus, the fact that Diatom was judgment proof does not establish Insurers' right to directed verdict on damages.

As support for its contention, Insurers cite Foremost County Mut. Ins. Co. v. Home Indem. Co., 897 F.2d 754, 757 (5th Cir. 1990), as holding that an underlying judgment constitutes no evidence of damages in a Stowers action if the judgment is accompanied

---

[22] An insurer in a liability policy agrees to defend the insured and protect it from liability. If the insurer is unsuccessful in protecting insured from liability and must settle or, if a judgment is rendered against the insured, the insured is not required to pay the obligation before the insurer is required to pay. If a judgment is rendered against the insured, the insurer's liability to pay attaches at that time. This obligation to pay continues until the judgment is satisfied.
 Conversely, an indemnity policy provides that the insurer's liability does not attach unless the judgment against the insured has actually been paid.
 See id. at 504.

by a covenant not to execute against the insured.[23]  The Foremost court, however, recognized the general rule that "[i]n Texas a covenant not to execute by an insured does not release an insurance carrier from liability." Id. at 758 (citing YMCA, 552 S.W.2d at 504-05).  Further, the Foremost court specifically indicated that, "under our decision not to extend the YMCA rule the insurer who negligently refuses to settle will be able to use a covenant not to execute only to the disadvantage of another insurer that has breached its duty to the insured . . . and not to the disadvantage of its insured." Id. at 760 (emphasis added).  We conclude that the Foremost opinion is not controlling because it is clearly distinguishable from the present case.  See Tex. Farmers Ins. Co. v. Soriano, 844 S.W.2d 808, 824-25 (Tex.App.–San Antonio 1992), rev'd on other grounds, 881 S.W.2d 312 (Tex. 1994) (discussing the limited application of the holding in Foremost).  We affirm the trial court's denial of Insurers' motion for directed verdict as to damages.

Next, we must consider whether the trial court erred in giving conclusive effect to the damages found in the underlying judgment.[24]  By directing verdict on the issue of damages

---

[23] While the Segers entered into a covenant not to execute the judgment against Gillman in the present case, we understand Insurers' argument to analogize a covenant not to execute with a judgment proof insured.  However, we conclude that the analysis and the result would be the same if Insurers were contending that the covenant not to execute precluded proof of harm to Diatom.

[24] Insurers contend that it was error for the judgment to have been admitted into evidence for the judge's eyes only.  However, the judgment was admitted into evidence. Because the trial court gave the judgment conclusive effect on the issue of damages and rendered a directed verdict in accordance with that judgment, the fact issue of the amount of damages suffered by Diatom was removed from the jury's consideration.  Therefore, whether the trial court erred in the manner in which it admitted the judgment is subsumed within the issue of whether the trial court erred in directing damages in accordance with this judgment and will be addressed below.

in accordance with the damages found in the underlying judgment, it is evident that the trial court found that the judgment set Diatom's damages as a matter of law. Insurers' contention that directed verdict was an inappropriate vehicle to establish damages is premised on their position that the evidence that Diatom was judgment proof raised a fact issue regarding whether Diatom was damaged by the excess damages awarded in the underlying judgment. However, for the reasons discussed above, we conclude that Diatom's financial status is immaterial to Diatom's liability and, therefore, fails to raise a fact issue regarding damages in the present suit.

A directed verdict is appropriate only when "reasonable minds can draw only one conclusion from the evidence." Collora v. Navarro, 574 S.W.2d 65, 68 (Tex. 1978). Review of a directed verdict requires that the evidence be viewed in the light most favorable to the party against whom judgment was entered and that all reasonable inferences from that evidence be resolved in that party's favor. Morgan, 27 S.W.3d at 929.

The general rule is that, in a Stowers action, damages are fixed as a matter of law in the amount of the excess of the judgment rendered in the underlying suit in favor of the plaintiff over the applicable limits of the policy. See Allstate Ins. Co. v. Kelly, 680 S.W.2d 595, 606 (Tex.App.–Tyler 1984, writ n.r.e.). See also Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 77 S.W.3d 253, 271 (Tex. 2002) (Baker, J., dissenting); State Farm Fire & Cas. Co. v. Gandy, 925 S.W.2d 696, 713 (Tex. 1996). Thus, absent evidence that the underlying judgment is not reliable evidence of the damages suffered by the insured in the underlying suit, the judgment conclusively establishes the damages suffered by the insured and is sufficient evidence to support a directed verdict.

While the general rule is that a judgment obtained by a plaintiff against an insured is conclusive to establish the amount of damages suffered by the insured in a subsequent Stowers action, see Kelly, 680 S.W.2d at 606, the Texas Supreme Court has created an exception to this general rule when the insured assigns his Stowers action to the plaintiff in the underlying suit, see Gandy, 925 S.W.2d at 714. When such an assignment occurs, the underlying judgment is not only not conclusive, but is inadmissible as evidence of damages, unless rendered as the result of a "fully adversarial trial." Id. Insurers contend that they presented evidence that would raise a fact question as to whether the judgment from the underlying suit was the result of a fully adversarial trial and, therefore, that the trial court erred in directing the verdict on damages in accordance with the underlying judgment.

Prior to trial, the Segers filed a motion for partial summary judgment in which they contended, *inter alia*, that the evidence established that the parties to the underlying suit were in a "fully adversarial relationship at the time of trial" and that an "actual trial" had occurred. The trial court granted the Segers' motion. However, we conclude that these findings by the trial court do not resolve whether the judgment in the underlying suit was the result of a fully adversarial trial.[25]

_____

[25] In reviewing the Segers' motion relating to these points, we note that the "fully adversarial relationship" issue in no way addressed the events occurring at the underlying trial. While the Court did not define "fully adversarial trial" in Gandy, we believe that a determination of whether a hearing constitutes a "fully adversarial trial" requires a review of the extent to which the parties to the proceeding participated. See Gandy, 925 S.W.2d at 713. When the judgment is an agreed judgment, default judgment, or when the underlying defendant's participation is so minimal as to evidence that the hearing was not adversarial, the judgment resulting from that hearing may not be admitted as evidence of damages in the Stowers action. See id. at 713, 714. As such, the determination of whether the hearing was fully adversarial requires review of the underlying proceedings.

28

At the close of evidence in the Stowers action, the Segers offered the judgment in the underlying suit for the court's review only and moved the trial court for directed verdict on damages based on the judgment. Insurers objected to admission of the judgment contending that it was not the result of a fully adversarial trial. The trial court overruled Insurers' objection and granted the Segers' motion for directed verdict on damages.

Directed verdict was proper, in this situation, only if no probative evidence was presented that would raise a genuine issue of material fact regarding the amount of damages suffered by Diatom as a result of Insurers' negligent failure to settle the underlying suit. See Dow Chem. Co., 46 S.W.3d at 242. As the Segers' only evidence of damages in the Stowers action was the judgment in the underlying suit, the trial court could only direct the verdict on damages if Insurers failed to raise a genuine issue of material fact regarding the reliability of the judgment as evidence of Diatom's damages.

Insurers raised the question of whether the judgment in the underlying action was the result of a fully adversarial trial. As evidence that it was not, Insurers correctly indicated that Diatom was not represented by counsel at the trial in the underlying suit, made no opening or closing statements, offered no evidence, and conducted no cross-examination of the Segers' witnesses. Further, Insurers cite the trial court's own characterization of this proceeding as a *nihil dicit* prove up.

We conclude that this evidence is sufficient to raise a genuine issue of material fact regarding whether the underlying judgment upon which the trial court directed the verdict

29

on damages was the result of a fully adversarial trial. <u>See</u> <u>Gandy</u>, 925 S.W.2d at 714.[26]
As such, we reverse the damages portion of the judgment.

## Evidentiary Exclusions

Insurers contend that they were denied evidence of collusion between the Segers and Diatom in the underlying proceeding because the trial court abused its discretion in sustaining Diatom's assertions of attorney-client privilege and work product privilege. As Insurers' issue challenges the exclusion of those documents that specifically relate to the underlying judgment and subsequent assignment, we will limit our review to those documents.[27] We must determine whether the trial court abused its discretion in upholding Diatom's assertions of privilege and, if so, whether the exclusion of this evidence harmed Insurers. <u>See</u> <u>May v. Barton's Pump Serv., Inc.</u>, 153 S.W.3d 469, 477-78 (Tex.App.–Amarillo 2004, no pet.).

Some of the evidence sought by Insurers was included in the appellate record in this cause. These documents were made part of the record on December 28, 2004. They were included in the appellate record after Diatom asserted its claims of privilege. Nothing

---

[26] "<u>In no event</u>, however, is a judgment for plaintiff against defendant, rendered <u>without a fully adversarial trial</u>, binding on defendant's insurer or admissible as evidence of damages in an action against defendant's insurer by plaintiff as defendant's assignee" (emphasis added).

[27] The documents submitted for the trial court's *in camera* review include documents that were prepared for the purpose of facilitating the rendition of legal services in defense of Insurers' third-party action against Diatom. These documents appear to be privileged under Texas Rule of Evidence 503(b), but, in any event, are not sought by Insurers through this issue.

in this court's file evidences any attempt by Diatom to recall these documents as privileged.[28]   See TEX. R. CIV. P. 193.3(d).   Therefore, for the present litigation, we conclude that Diatom's prior assertion of privilege as to these documents has been waived.

Using these disclosed documents, Insurers contend that other documents relating to the underlying proceeding are discoverable and admissible.  After reviewing all of the documents provided to the trial court for *in camera* inspection, the documents Insurers seek by this issue are duplicates of the documents that were included in the appellate record.  As Diatom's prior assertions of privilege regarding these documents have been waived, we overrule Insurers' issue as moot.

## Recusal of Judge

Insurers contend that the denial of their motion to recuse Judge LaGrone was an abuse of discretion because, as the judge that presided over the underlying trial, Judge LaGrone was a vital material witness in the Stowers suit and had personal knowledge of disputed material facts.  The denial of a motion to recuse is reviewed for abuse of discretion.  Brosseau v. Ranzau, 81 S.W.3d 381, 399 (Tex.App.–Beaumont 2002, pet. denied).  Insurers contend that the Segers' citation to Judge LaGrone's statement in the underlying trial transcript that "The Court will call for trial in Cause No. 30,110, . . ." made Judge LaGrone a vital material witness in the Stowers action.  However, the complete

---

[28] However, the conclusion that Diatom has not attempted to "snap back" these documents is not a determination that it has waived its claim of privilege.  Because Diatom is no longer a party to the present action, Insurers' identification of the disclosure of these documents does not necessarily result in Diatom's actual knowledge of the disclosure.

31

transcript of the underlying proceeding, which includes the statement Insurers complain of, was admitted into evidence in the Stowers action. Further, Judge LaGrone's calling the underlying proceeding for trial did not constitute his participation "as . . . material witness in the matter in controversy." TEX. R. CIV. P. 18b(2)(d). Certainly, as addressed above, Insurers may refute Judge LaGrone's characterization of the underlying proceeding as a "trial," but we do not conclude that the trial court abused its discretion in denying Insurers' motion for recusal on this basis.

Additionally, Insurers contend that Judge LaGrone must have knowledge of disputed evidentiary facts regarding whether the underlying proceeding was, in fact, a fully adversarial trial. However, Insurers fail to identify any specific knowledge of disputed evidentiary facts purportedly held by Judge LaGrone. We will not find recusal appropriate solely on the basis of speculation regarding facts that may or may not be known by the presiding judge.

We overrule Insurers' challenge to the denial of their motion to recuse.

Disqualification of Counsel

Finally, Insurers contend that two attorneys in the Segers' counsel, Brian Heinrich and Joe Hayes, were disqualified from representing the Segers in their Stowers action because each (1) were witnesses in the Stowers action, see TEX. DISC. R. PROF. COND. 3.08, and (2) were to be paid on a contingent basis, see TEX. DISC. R. PROF. COND. 3.04. The denial of a motion for disqualification is reviewed for abuse of discretion. See Metro. Life Ins. Co. v. Syntek Fin. Corp., 881 S.W.2d 319, 321 (Tex. 1994). As both parties to the

32

present dispute acknowledge, the disqualification of counsel is a severe remedy, which is not to be invoked lightly. See In re Nitla S.A. de C.V., 92 S.W.3d 419, 422 (Tex. 2002). Even if challenged counsel has committed a disqualifying act, the party requesting disqualification must demonstrate that counsel's conduct caused actual prejudice. Id.

Assuming, without deciding, that Heinrich and/or Hayes were lawyer-witnesses such that they would be disqualified from representing the Segers in the Stowers action, Insurers have failed to present any evidence that they were harmed. Insurers cite a deposition of Professor Bob Schuwerk, which is not a part of the record, as concluding that Heinrich and Hayes violated Rules 3.04 and 3.08 of the Texas Disciplinary Rules of Professional Conduct. However, proof that an attorney violated a Rule of Professional Conduct, without a further showing of harm, is insufficient to justify disqualification. Id. Nothing in Insurers' discussion of Schuwerk's deposition identifies how they were harmed by any alleged violation of the Rules by either Heinrich or Hayes.

Insurers contend that the trial court took certain unrelated actions to avoid having to rule that Heinrich and Hayes were disqualified to represent the Segers in the Stowers action, however, this contention is wholly unsupported by evidence and is purely speculative. See Miller v. Hood, 536 S.W.2d 278, 285 (Tex.Civ.App.–Corpus Christi 1976, writ ref'd n.r.e.) (presumption of regularity and validity of trial court rulings unless facially invalid or invalidity shown in the record). Additionally, while Insurers contend that Hayes and Heinrich were disqualified because they were witnesses whose payment was contingent upon the outcome of the case, Insurers fail to identify any evidence establishing that Hayes or Heinrich were being paid on a contingent basis.

33

We overrule Insurers' issue regarding the denial of their motion to disqualify Hayes and Heinrich.

## Conclusion

We affirm the trial court's denial of Insurers' motion to recuse, denial of Insurers' motion to disqualify counsel, and grant of summary judgment on the issue of whether the Segers made a sufficient settlement demand within the CGL policy limits. In all other respects, we reverse the judgment and remand this cause for new trial consistent with this opinion.

Mackey K. Hancock
Justice