ACCEPTED
05-14-00896
FIFTH COURT OF APPEALS
DALLAS, TEXAS
2/26/2015 3:48:03 PM
LISA MATZ
CLERK

5th Court of Appeals
FILED: 2/26/15
Lisa Matz, Clerk

**Case No. 05-14-00896-CV**

IN THE FIFTH

COURT OF APPEALS FOR

THE STATE OF TEXAS

RECEIVED IN
5th COURT OF APPEALS
DALLAS, TEXAS
2/26/2015 3:48:03 PM
LISA MATZ
Clerk

---

PIERRE INVESTMENTS, INC.

v.

DAVID CORONA d/b/a CORONA AND SON
CONSTRUCTION

---

On Appeal From The 162th District Court of
Dallas County Texas

---

AMENDED BRIEF OF APPELLANT

---

Walter F. Musgrove III
State Bar No. 24075514
PO Box 132274
Dallas, Texas 75313
(972)900-3116 Office
(972) 364-1235 FAX
walter@musgrovelawfirm.com

ATTORNEY FOR APPELLANT

ORAL ARGUMENT REQUESTED

0

# IDENTITY OF PARTIES AND COUNSEL

**APPELLANT/PLAINTIFF**

Pierre Investments, Inc.

**COUNSEL FOR APPELLANT**

Walter F. Musgrove III
State Bar No. 24075514
PO Box 132274
Dallas, Texas 75313
972-900-3116 (O)
972-364-1235 (F)
walter@musgrovelawfirm.com

**APPELLEE/DEFENDANT**

David Corona d/b/a Corona and Son Construction

**COUNSEL FOR APPELLEE**

Lyndon Laird
Whitaker Chalk Swindle & Schwartz PLLC
301 Commerce Street
Suite 3500
Fort Worth, Texas 76102-4135
817-878-0507 (o)
817-878-0501 (f)
llaird@whitakerchalk.com

# TABLE OF CONTENTS

**IDENTITY OF PARTIES AND COUNSEL**………………….…………..iii

**INDEX OF AUTHORITIES**…………………………………...…….v-vi

**STATEMENT OF THE CASE**……………………………………….1

**ISSUE PRESENTED**…………………………..……………….2

**STATEMENT REGARDING ORAL ARGUMENT**…………………….2

**STATEMENT OF FACTS**………………………………………….2

**STANDARD OF REVIEW**………...……………….…………….2-3

**ARGUMENT**…………………………...…………………3-7

**CONCLUSION AND PRAYER**……………………………………...8

**CERTIFICATE OF SERVICE**………………………………………8

**APPENDIX:**

    **A. CORRECTED FINAL JUDGMENT**

    **B. PLAINTIFF'S FIRST AMENDED PETITION**

    **C. IMPROVED PROPERTY CONTRACT (Plaintiff's exhibit 10)**

    **D. GEHARD LUXURY HOMES – FORM AGREEMENT BETWEEN OWNER AND CONTRACTOR (Plaintiff's exhibit 11)**

    **E. Termination Letters/Notice of Buyers Termination of Contract (Plaintiff's exhibit 15)**

    **F. Excerpt from Mr. Ken Gazian's trial testimony**

# INDEX OF AUTHORITIES

**CASES**

*Air Conditioning v. Harrison-Wilson-Pearson*, 151 Tex. 635, 253 S.W.2d 422, 425 (1952)……………………………………………………………………………….7

*Basin Operating Co. v. Valley Steel Prods. Co.,* 620 S.W.2d 773, 776 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e.)…………………………………….…15

*Bayer Corp. v. DX Terminals, Ltd*., 214 S.W.3d 586 (Tex. App.-Houston 2006) ………………………………………………………………………….....11-12

*Chas M. Cain v. Salvatore Fontana d/b/a Fontana's Café, 423 S.W.2d 134 (Tex.Civ.App.—San Antonio 1967)*………………………………………………15

*Cliff's Drilling Co., v. Burrows*, 930 S.W.2d 709, 712 (Tex.App.—Houston [1ˢᵗ Dist.] 1996, no writ.)……………………………………………………….....7

*Cline v. Insurance Exchange of Houston*, 154 S.W.2d 491, 493 (Civ. App.— Galveston 1941), aff'd, 140 Tex. 175, 166 S.W.2d 677 (1943)………..……….......6

*Coca-Cola Bottling Co. v. Burgess*, 195 S.W.2d 379, 381 (Civ.App.-Fort Worth 1946, ref. n.r.e.)……………………………………………………………..7

*Comiskey v. FH Partners, LLC*, 373 S.W.3d 620 (Tex. App.-Houston [14 Dist.] 2012)……………………………………………………………………………7

*Freeman v. Greenbriar Homes, Inc*. 715 S.W.2d 394, 395 (Tex.App.-Dallas 1986, ref. n.r.e)…………………………………………………………….....7, 9

*George Deutsch v. Hoover, Bax & Slovacek, LP*, (Tex. App.-Houston [14ᵗʰ Dist.] 2002)…………………………………………………………………………..8

*Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 918 (Tex. 1985)…………16

*Mangham v. Hall*, 564 S.W.2d 465 (Tex. Civ. App. 1978)…………………..15

*Meridien Hotels, Inc. v. LHO Financing Partnership I, L.P*., 255 S.W.3d 807 (Tex. App.-Dallas 2008)…………………………………………………………………………...15

*M.N. Dannenbaum v. Brummerhop*, 840 S.W.2d 624 (Tex. App.-Hous. [14 Dist.] 1992)………………………………………………………………...……12-14

*Murphy v. Fannin County Elec. Co-op, Inc.,* 957 S.W.2d 900, 903 (Tex. App.—Texarkana 1997, no pet.)…………………………………...…………...…..15

*Porterfield v. Brinegar*, 719 S.W.2d 558, 560 (Tex. 1986)………………….........…7

*Prudential Insurance Company of America v. Financial Review Services, Inc*., 29 S.W.3d 74 (Tex. 2000)…………………………….………………………….………8-9

*Thomas v. Olympus/Nelson Property Management*, 148 S.W.3d 395 (Tex. App.-Houston [14 Dist.] 2004)……………………………..…………………..…8

*White v. Southwestern Bell Telephone Company, Inc*., 651 S.W.2d 260 (Tex. 1983) …………..…………………………………………………………………7

*Wilen v. Falkenstein*, 191 S.W.3d 791 (Tex. App.-Fort Worth 2006)….……….14

*Wilson & Wilson Tax Services, Inc. v. Mohammed*, 131 S.W.3d 231 (Tex. App.-Houston [14 Dist.] 2004)……………………………………………... 8

*Yorkshire Insurance Co., Ltd. v. Seger*, 279 S.W.3d 755 (Tex. App.-Amarillo 2007)…………………………………………………………...…8

---

## APPELLANT'S BRIEF

_____

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Appellant, Pierre Investments, Inc., and files this Appellant's

Brief and would respectfully show:

## Statement of the Case

*Nature of Case*

> Appellant who owned two residential lots on which it had contracts to sell the lots and build custom homes sued Appellee for trespass to real property, tortious interference with plaintiff's business contracts, and tortious interference with prospective business relations after Appellee dumped debris on the two lots which resulted in the loss of both the contracts the Appellant had entered.   (RR Vol. 002, 72-73 and 75-77[1]) (CR 30-34)

*Trial Court*

> 162nd Judicial District Court

*Trial Court's Disposition*

> Ruled as a matter of law that the Defendant trespassed onto Plaintiff's property but Plaintiff failed to establish a casual connection between said trespass and claimed damages loss of a land sale contract and construction contract. (CR. 90-91)

## Statement Regarding Oral Argument

---

[1] References to the Report's Record will be made by (RR Vol.__, ___) showing the volume and page number. References to the Clerk's Record will be made by (CR __) showing page number.

Pursuant to Texas Rules of Appellate Procedure 39.1, Appellant requests oral argument and submits that it would materially aid the decisional process in this case since the lower court's ruling is clearly contrary to Texas case law.

## Statement of Facts

On or about October 28, 2010, Appellee intentionally dumped multiple truckloads of construction debris upon Appellant's residential building lot located at 2000 St. Pierre Drive, Carrolton, Texas 75006. (RR Vol. 002, 79-81). As a result of the dumping, the Appellant's client, who had contracted to purchase the lots and construct two custom homes, cancelled all contracts after discovering construction debris had been dumped on the lots. (RR Vol. 002, 82-83; RR.007-Part A, 38-40; Pl. Ex. 15). The Appellant's client cancelled the contracts under a contractual provision, promulgated by the Texas Real Estate Commission, stating and promising that the lots were clean from any legal encumbrances and ready to build. (RR Vol. 007-Part A, 20-29; Pl. Ex. 10)

## Issue Presented

Was it proper for the trial court to direct verdict on Appellant's claims for lost profits resulting from the cancelled real estate sale and construction contracts?

## Standard of Review

To instruct a verdict or to dismiss a jury and render judgment the court must find that movant is entitled to judgment as a matter of law. *Cline v. Insurance Exchange of Houston*, 154 S.W.2d 491, 493 (Civ. App.—Galveston 1941), aff'd,

6

140 Tex. 175, 166 S.W.2d 677 (1943); *Coca-Cola Bottling Co. v. Burgess*, 195 S.W.2d 379, 381 (Civ.App.-Fort Worth 1946, ref. n.r.e.).

An instructed verdict is proper only when the evidence is such that no other verdict should be rendered. Thus, if there is any conflicting evidence in the record, a determination of the issue is for the jury. *See Air Conditioning v. Harrison-Wilson-Pearson*, 151 Tex. 635, 253 S.W.2d 422, 425 (1952); *Porterfield v. Brinegar*, 719 S.W.2d 558, 560 (Tex. 1986). The reviewing court's task on appeal is to determine whether the record, regarded in the light most favorable to the losing party, contains any probative evidence to raise material fact issues in the case. *Freeman v. Greenbriar Homes, Inc*. 715 S.W.2d 394, 395 (Tex.App.-Dallas 1986, ref. n.r.e); *Cliff's Drilling Co., v. Burrows*, 930 S.W.2d 709, 712 (Tex.App.—Houston [1st Dist.] 1996, no writ.).

## Argument

### I.  The Court's Directed Verdict was Inappropriate

Texas courts have routinely held that where conflicting evidence exists, a directed verdict is not proper. *See White v. Southwestern Bell Telephone Company, Inc*., 651 S.W.2d 260 (Tex. 1983) (holding that the trial court erred in granting a directed verdict since there was conflicting evidence as to Appellant's loss in net profits); *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620 (Tex. App.-Houston [14 Dist.] 2012) (holding that the trial court erred by granting a directed verdict on

7

Appellant's waiver claim); *Yorkshire Insurance Co., Ltd. v. Seger*, 279 S.W.3d 755 (Tex. App.-Amarillo 2007) (holding that the trial court erred in granting a directed verdict on the issue of oppression and civil conspiracy); *Thomas v. Olympus/Nelson Property Management*, 148 S.W.3d 395 (Tex. App.-Houston [14 Dist.] 2004) (holding that a directed verdict was erroneous as to appellant's wrongful-eviction claim); *Wilson & Wilson Tax Services, Inc. v. Mohammed*, 131 S.W.3d 231 (Tex. App.-Houston [14 Dist.] 2004) (holding that the trial court erred by granting a directed verdict since there was a fact issue concerning the validity of a promissory note); *George Deutsch v. Hoover, Bax & Slovacek, LP*, 97 S.W.3d 179 (Tex. App.-Houston [14th Dist.] 2002) (holding that a directed verdict was improper as to Appellant's claim for fee forfeiture based on alleged breaches of fiduciary duty).

Specifically, with regard to granting a directed verdict for tortious interference with a contract, in *Prudential Insurance Company of America v. Financial Review Services, Inc.*, 29 S.W.3d 74 (Tex. 2000), the Texas Supreme Court ruled that the trial court erred by granting a directed verdict in favor of defendant Prudential. *Prudential Insurance Company of America,* 29 S.W.3d at 83. The Court affirmed the appellate court's decision to remand the case to the trial court for a jury determination on the issue of contract interference. *Id*. at 77. Specifically, the Court found that there was inconclusive evidence regarding the defendant's justification defense against tortious interference. *Id*. at 76. Plaintiff Financial Review Services argued that Prudential interfered with its contracts as a result of Prudential

dismissing Financial Review Service's medical claims against Prudential's policyholders and a resulting back-billing of claims. *Id*. The evidence established that Prudential's argument that Financial Review Services is merely an agent of the parties with whom FRS lost its contracts was without merit. *Id*. at 78-80. Secondly, Prudential's defense of justification for its interference was denied by the Court since Financial Review Services presented evidence which established that Prudential falsely accused it of double billing and pressured another party to the contract to stop using Financial Review Services. *Id*. at 80-82.

Here, similar to *Prudential Insurance Company of America*, the lower court also erred in granting Appellee's directed verdict based on conflicting evidence. (CR. 90-91). The testimony of the Appellant's representative, Ken Gazian, and it client, Inna Geyvandova, clearly established that the trespass and subsequent illegal dumping on Appellant's property preceded and caused the cancellation of the contracts. (RR. Vol.003, 148-149). Any confusion or conflicting testimony concerning the exact date of the dumping, or whether the dumping preceded cancellation of the contracts, should be resolved in Appellant's favor since he is the losing party in this case. *See Freeman*, 715 S.W.2d at 394. In the instant case, there is no other evidence that diminishes Appellant's claim that Appellee's trespass and illegal dumping resulted in the termination of the contracts with its client Inna Geyvandova.

The lower court ignored the conflicting evidence in the record and rendered a decision in lieu of a jury determination. The Court erred by ignoring voluminous testimony establishing that the dumping preceded the cancellation of the contracts. (RR Vol. 002, 72-73, 75-77, 82-83; RR. Vol.003, 148-149; RR.007-Part A, 38-40; Pl. Ex. 15). Specifically, Inna Geyvandova testified that she cancelled her contract with the Appellant based solely on the Appellee's illegal dumping onto Appellant's lot. (RR. Vol.003, 148-149, 181). Inna Geyvandova testified:

> "I didn't -- I didn't wanna think about it anymore. I was done. When I saw those dumpings, I was done, I was out. I wanted out of this project. I didn't wanna deal with it anymore. I didn't trust the project anymore."[2]

Further, two letters from Inna Geyvandova, which were presented during trial, clearly indicate that the Appellee's trespass occurred before the contract was terminated. These letters specifically state as follows:

> "…I am letting you or anyone in your firm know that our contract dated October 1, 2010, pertaining to properties located at 2000 and 2004 St. Pierre in Carrollton, was terminated due to unexpected dumping activities discovered upon my last visit to the site."[3]

The subsequent letter states as follows:

> "…where I discovered several piles of unknown materials being dumped onto the site by construction trucks…I didn't have time nor could I afford the continuous cleanup disputes, environmental charges or assessments, and

---

[2] (RR. Vol. 003, 181)
[3] (RR.007-Part A, 39; Pl. Ex. 15).

10

> therefore, I decided to walk away from purchasing any of these properties and/or continue on with my anticipated construction project."[4]

Lastly, The Notice of Buyer's Termination of Contract which was also presented during the trial also indicates the reason Ms. Geyvandova terminated the contract was the "unexpected dumping activity." (RR.007-Part A, 38; Pl. Ex. 15).

In *Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586 (Tex. App.-Houston 2006), the lower court denied defendant Bayer's request for a directed verdict on the basis that the evidence did not conclusively demonstrate that DX's breach substantially impaired the value of the whole contract and thereby justified Bayer's subsequent cancellation. *Id.* at 594. The evidence presented by Bayer during trial failed to conclusively establish its assertion. Specifically, Bayer presented evidence that DX failed to take the required minimum caustic soda supply as outlined in their agreement. *Id.* at 595. Bayer also provided witness testimony alleging that Bayer was not a regular supplier of caustic soda and the oversupply of caustic soda in its inventory, due to DX's failure to take the minimum, could have closed production at Bayer's entire facility. *Id.* However, DX established that Bayer had not objected to previous failures to take the monthly caustic soda minimum. *Id.* at 596. Next, DX presented totals taken from the alleged four month breach and said totals showed that DX's failure to take the monthly minimum only represented a mere three percent of the target monthly minimum over the life of the contract. *Id.* at 596. Therefore,

---

[4] (RR.007-Part A, 40; Pl. Ex. 15).

11

conflicting evidence existed as to Bayer's claim that DX's breach substantially impaired the value of the whole contract and thereby justified Bayer's subsequent cancellation. Accordingly, the appellate court affirmed the lower court's holding which denied Bayer's request for a directed verdict.

Here, similar to *Bayer Corp.*, the evidence of record clearly demonstrates that Inna Geyvandova cancelled her contract with Appellant solely because of Appellant's illegal dumping onto Appellant's lot. (RR. Vol.003, 148-149, 181). Therefore, conflicting evidence existed as to whether Geyvandova cancelled her contract with Appellant due to Appellee's actions and accordingly, the lower court's directed verdict was inappropriate.

In *M.N. Dannenbaum v. Brummerhop*, 840 S.W.2d 624 (Tex. App.-Hous. [14 Dist.] 1992), the appellate court affirmed the lower court's directed verdict in favor of defendant Brummerhop on the claim of tortious interference. *M.N. Dannenbaum,* 840 S.W.2d at 630. To prove a claim for tortious interference, one must establish that there was a contract subject to interference, the act of interference was willful and intentional, such intentional act was a proximate cause of plaintiff's damage, and actual damage or loss. *Id*. at 630 (citing *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.*, 793 S.W.2d 660, 664 (Tex. 1990). In *M.N. Dannenbaum*, evidence showed that a valid contract existed between Dannenbaum and Gestra and that after resigning from Dannenbaum, defendant Brummerhop solicited the Gestra contract. *Id*. As a result, Gestra terminated its contract with plaintiff Dannenbaum and entered

12

into a contract with Brummerhop. *Id*. However, the appellate court affirmed the lower court's directed verdict in favor of defendant Brummerhop since Gestra had the right under its contract to terminate its relationship with Dannenbaum and Brummerhop had the right to persuade Gestra to exercise this right. *Id*.

Here, unlike the defendant in *M.N. Dannenbaum*, the Appellee in the instant case did not rightfully persuade Inna Geyvandova to exercise her right to terminate her contracts with Appellant. Rather, the Appellee willfully and intentionally interfered with Appellant's contract with Inna Geyvandova by illegally dumping construction debris onto Appellant's lot without permission from the Appellant. Appellee's act was the proximate and sole cause of Appellant's damage as testified to by Ken Gazian and Inna Geyvandova since there was no evidence of any other cause of Ms. Geyvandova's cancellation of the contract. (RR. Vol.003, 181). Specifically, Inna Geyvandova testified the trespass was the sole reason she terminated the contract. (R.3 at 148-49, 155).

Lastly, Appellant suffered a loss of two contracts with its client—Inna Geyvandova. (RR. Vol.002, 91-93). When asked on direct examination if he had damages as a result of the trespass, the Appellant testified:

> "I lost two my contracts for sale of the lots. I lost my two
> contracts to build two homes. I paid extra 10 percent on

13

the city liens that they assessed the properties. I paid taxes.

I paid homeowners association dues…"[5]

Therefore, the instant case is distinguishable from *M.N. Dannenbaum* where the appellate court affirmed the lower court's directed verdict. In the case at hand, the evidence shows that there is conflicting evidence in the record and that a directed verdict was improper. In fact, there was no evidence presented by the Appellee that the Appellant did not suffer any damages as a result of the trespass.

## II. <u>Appellant is Entitled to Damages for Trespass</u>

To recover damages for trespass to real property, a plaintiff must prove that 1) the plaintiff owns or has a lawful right to possess real property, 2) the defendant entered the plaintiff's land and the entry was physical, intentional, and voluntary, and 3) the defendant's trespass caused injury to the plaintiff. *Wilen v. Falkenstein*, 191 S.W.3d 791, 798 (Tex. App.-Fort Worth 2006). Trespass requires only proof of interference with the right of possession of real property and the only relevant intent is that of the actor to enter the property. *Id*. The actor's awareness of the property's ownership is irrelevant. *Id*.

Recovery of actual damages in trespass for temporary injury is limited to the amount necessary to place plaintiff in the position it would have been in but for the trespass, including cost of restoration or repair of the land to its former condition,

---

[5] (RR. Vol.002, 91).

loss of use of the land, and loss of expected profits from use of land. *Meridien Hotels, Inc. v. LHO Financing Partnership I, L.P.*, 255 S.W.3d 807, 821 (Tex. App.-Dallas 2008). *See also Mangham v. Hall*, 564 S.W.2d 465, 468 (Tex. Civ. App. 1978). Texas courts allow an owner of property to recover for lost profit due to unauthorized dumping. In *Chas M. Cain v. Salvatore Fontana d/b/a Fontana's Café*, 423 S.W.2d 134 (Tex.Civ.App.—San Antonio 1967), the court upheld a judgment for lost profits suffered as a result of the defendant's trespass. The defendant dumped debris in the parking lot of the plaintiff's café which resulted in the plaintiff losing profit.

Similar to the plaintiff in *Cain*, in the present case, the Appellant testified that he also lost the profit he expected to make from the sale of the land on which the appellee trespassed. (RR. Vol.002, 91). Further, similar to the plaintiff in *Cain*, the Appellant also testified that he lost profit he expected to make from the construction of two custom homes he planned to build on the land on which the appellee trespassed. (RR. Vol.002, 92-93).

## New Trial Should be Granted in the Interest of Justice and Fairness

If a finding is against the great weight and preponderance of the evidence, the inquiry is whether the finding is so contrary to the overwhelming weight of all relevant evidence as to be clearly wrong and unjust." *Murphy v. Fannin County Elec. Co-op, Inc.,* 957 S.W.2d 900, 903 (Tex. App.—Texarkana 1997, no pet.). A new trial is the proper remedy when the findings are contrary to the great weight and preponderance of the evidence, but supported by some evidence. *Basin Operating*

15

*Co. v. Valley Steel Prods. Co.,* 620 S.W.2d 773, 776 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e.). Clearly in this case there was evidence presented which lead the Court to rule that there was a trespass by Appellee onto Appellant's property. (CR 90-91). There was also testimony that the trespass occurred before the cancellation of the contract that formed the basis of the Appellant's damages. (RR Vol. 002, 72-73, 75-77, 82-83; RR. Vol.003, 148-149; RR.007-Part A, 39; Pl. Ex. 16; RR.007-Part A, 40; Pl. Ex. 16).

The trial court has broad discretion to order a new trial "in the interest of justice*." Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 918 (Tex. 1985). To not grant the new trial would be unfair and unjust as it would completely disregard the evidence and testimony that was presented which creates fact issues for the jury and that also supported the Appellant's claims for trespass and damages.

WHEREFORE, Appellant respectfully requests that it's Motion for New Trial be GRANTED.

## Conclusion and Prayer

For all the reasons cited herein, the Appellant requests that this Court hold that:

1. The trial court erred as a matter of law in issuing a directed verdict when there was conflicting evidence on whether the trespass was the proximate cause of damages.

16

Respectfully submitted,

*/s/Walter Musgrove*
Walter F. Musgrove III
State Bar No. 24075514
PO Box 132274
Dallas, Texas 75313
(972)900-3116 Office
(972) 364-1235 FAX
walter@musgrovelawfirm.com

ATTORNEY FOR APPELLANT

**CERTIFICATE OF SERVICE**

This will certify that a true and correct copy of this pleading was served in via facsimile and electronic mail on February 24, 2015 to:
Lyndon Laird
817-878-0501 (f)
llaird@whitakerchalk.com
Attorney for Appellee, David Corona d/b/a Corona and Son Construction

*/s/Walter Musgrove*
Walter Musgrove III

**CERTIFICATE OF COMPLIANCE**

This will certify that this pleading contains 3,447 words and is in compliance with the Texas Rules of Appellate Procedure.

*/s/Walter Musgrove*
Walter Musgrove III

A

4A9L000034

CAUSE NO. DC 12-12422-I

| | | |
|---|---|---|
| PIERE INVESTMENTS, INC. | § | IN THE DISTRICT COURT |
| Plaintiff | § | |
| V. | § | 162nd JUDICIAL DISTRICT |
| DAVID CORONA d/b/a CORONA AND SON CONSTRUCTION | § | |
| Defendants | § | DALLAS COUNTY, TEXAS |

## CORRECTED FINAL JUDGMENT

On or about February 26, 2014, the above-referenced cause came on for trial and a jury was properly impaneled. After considering the evidence presented during two days of testimony the Court ruled as a matter of law that Defendant trespassed onto Plaintiff's property but that Plaintiff failed to establish a causal connection between said trespass and claimed damages for loss of a land sale contract and construction contract.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Plaintiff be awarded $1.00 nominal damages for trespass and that Defendant's Motion for Directed Verdict regarding Plaintiff's claim for loss of contract damages is herein is GRANTED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all Court Costs are taxed against Defendant.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all relief not expressly granted in this Judgment is hereby denied and that this judgment is final and appealable.

SIGNED on this the 1st day of July, 2014.

_____
HONORABLE JUDGE PRESIDING

B

CAUSE NO. 12-12422

| | | |
|---|---|---|
| PIERE INVESTMENTS, INC. | § | IN THE DISTRICT COURT |
| Plaintiff | § | |
| v. | § | 162 JUDICIAL DISTRICT |
| DAVID CORONA d/b/a CORONA AND SON CONSTRUCTION | § | |
| Defendants | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S FIRST AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

PIERRE INVESTMENTS, INC., Plaintiff complains of DAVID CORONA d/b/a CORONA AND SON CONSTRUCTION, Defendant, and for cause of action shows:

**1.**

PIERRE INVESTMENTS, INC., Plaintiff is a corporation doing business in Dallas County, Texas. DAVID CORONA d/b/a CORONA AND SON CONSTRUCTION, Defendant is an individual doing business in Dallas County, who may be served with citation at 156 Yale Avenue, Lewisville, Texas 75057. Discovery is intended to be conducted under level 2 of the Texas Rules of Civil Procedure.

**2.**

On or about November 3, 2010, at the time of the incident made the subject of this suit, Plaintiff's residential building lot located at 2000 St. Pierre Drive, Carrolton, Texas 75006 was subjected to illegal dumping of construction debris by Defendant, or one of Defendant's employees acting in the course and scope of their employment. The Plaintiff does not contend that the construction debris and/or dirt that was illegally dumped on the Plaintiff's property was contaminated. However, the Plaintiff does believe that if the construction debris and dirt were not

30

contaminated the Defendant most likely would have either stored the dirt on its development site and/or sold the dirt.

**3.**

As a result of Defendant's illegal and malicious act, Plaintiff has been damaged and Plaintiff, as a foreseeable consequence of Defendant's actions lost the sale of said lot and the adjoining lot, together with a construction contract for the subject lot and the adjoining lot. Plaintiff sues in a sum exceeding the minimal jurisdictional limits of this Court for this lost business opportunity.

**4.**
**Negligence Per Se**

Defendant's conduct constitutes negligence per se in that Defendant's conduct was in violation of one or more statutes or ordinances, including but not limited to, Chapter 365 of the Texas Health and Safety Code. Defendant pled, "nocontest" to illegal dumping in case number 0013439, City of Carrollton vs. David Corona, and was assessed a $2,000.00 fine.

**5.**
**Gross Negligence**

Defendant's conduct and that of its agents, servants or employees acting within the scope of their employment constituted gross negligence in that Defendant's actions in dumping construction debris onto Plaintiff's lot demonstrated an entire want of care that tends to show Defendant's conscious indifference to the welfare of Plaintiff. Defendant had both actual and constructive knowledge that this lot did not belong to him and that dumping the construction debris on Plaintiff's property would constitute an extreme risk of harm and devaluation of Plaintiff's property.

## 6.
## Tresspass to Real Property

Defendant's conduct and that of its agents, servants or employees acting within the scope of their employment constituted trespass to real property. The Plaintiff owned the land and the Defendant entered the Plaintiff's land intentionally and voluntarily. As a result of the trespass the Plaintiff suffered actual damages.

## 7.
## Tortious Interference with Plaintiff's Business Contacts

Defendant's conduct and that of its agents, servants or employees acting within the scope of their employment constituted tortious interference with Plaintiff's business contacts and customers. At the time of the illegal dumping, there was a valid contract for the sell of the land and signage regarding the owner of the land and the broker that was contracted to sale the land. The Defendant willfully and intentionally interfered with the contract for the purchase of the land which was a proximate cause of the actual damage and loss of contract.

## 8.
## Tortious Interference with Prospective Business Relations

Defendant's conduct and that of its agents, servants or employees acting within the scope of their employment constituted tortious interference with prospective business relations. At the time of the illegal dumping, there was a probability that the Plaintiff was going to enter into a contract for the construction of a home with the buyer that purchased the land from the Plaintiff. At the time the Defendant illegally dumped the dirt there were signs (broker for the sale of the land and Pierre Investments) on the lots. By illegally dumping the construction debris on the Plaintiff's land, the Defendant intentionally interfered with the prospective business relationship and the Defendant's conduct (trespass to real property) was independently tortuous. The interference caused the Plaintiff to lose the contract he had to sell the land and construct the house on the land.

As a proximate result of the negligence, trespass, tortious interference with prospective business relations, tortious interference with business relations tortuous and gross negligence of Defendant, as more fully described above, Plaintiff's sustained damages in an amount that exceeds the jurisdictional minimum of the court for which Plaintiff sues.

## Attorney's Fees

For the foregoing reasons, Plaintiff is entitled to attorney's fees and court costs pursuant to Chapter 365 of the Texas Health and Safety Code.

## Damages

As a direct result and proximate cause of Defendant's conduct, Plaintiff has been damaged as follows:

1. Loss of Unimproved Land Sale contract with Inna Gevandova - $76,000

2. Loss of Residential Construction contract with Inns Gevandova - $180,000

3. Interest paid to City of Carrollton liens after lost sale - $11,088

4. HOA dues after lost sale - $600

5. Taxes after lost sale - $732

WHEREFORE, Plaintiff prays that Defendant be cited to appear and answer and that, on final trial, Plaintiff have the following:

1. Judgment against Defendant in a sum within the jurisdictional limits of this Court;

2. Prejudgment and post-judgment interest as provided by law;

3. Exemplary damages against Defendant in an amount to be determined by the trier of fact;

4. Costs of suit;

5. Attorney's Fees;

6. Loss of land sale - $76,000.00 ($160,000 first contract which was lost contact minus $84,000 current sale);

7. Loss of two construction contracts

8. HOA dues after lost sale

9. Interest on City of Carrollton liens after lost sale; and

10. Such other relief to which Plaintiff may be justly entitled.

Respectfully Submitted,
 */s/Walter Musgrove*
**Walter F. Musgrove III**
State Bar I.D. No. 24075514
Frank L. Hill
State Bar No. 09631500
PO Box 132274
Dallas, Texas 75202
(972)900-3116 Office
(972)364-1235 FAX
walter@musgrovelawfirm.com
ATTORNEYS FOR THE PLAINTIFF

**Certificate of Service**

This will certify that a true and correct copy of this pleading was served in conformance with the Texas Rules of Civil Procedure on this 7th day of February, 2014.

 */s/Walter Musgrove III*
**Walter F. Musgrove III**

C

## UNIMPROVED PROPERTY CONTRACT
NOTICE: Not For Use For Condominium Transactions

1. **PARTIES:** The parties to this contract are _Pierre Investments, Inc._ (Seller) and _Inna Geyvandova_ (Buyer). Seller agrees to sell and convey to Buyer and Buyer agrees to buy from Seller the Property defined below.

2. **PROPERTY:** Lot _17R and 18R_, Block _A_ _Josey Parks Estate_ Addition, City of _Carrollton_ County of _Dallas_ Texas, known as _2000 and 2004 St. Pierre, Carrollton, Texas 75006_ (address/zip code), or as described on attached exhibit together with all rights, privileges and appurtenances pertaining thereto, including but not limited to: water rights, claims, permits, strips and gores, easements, and cooperative or association memberships (the Property).

3. **SALES PRICE:**
   A. Cash portion of Sales Price payable by Buyer at closing.............. $ _36,000.00_
   B. Sum of all financing described below (excluding any loan funding fee or mortgage insurance premium) .................................... $ _144,000.00_
   C. Sales Price (Sum of A and B) ............................................ $ _180,000.00_

4. **FINANCING:** The portion of Sales Price not payable in cash will be paid as follows: (Check applicable boxes below)
   ☒ A. THIRD PARTY FINANCING: One or more third party mortgage loans in the total amount of $_____ (excluding any loan funding fee or mortgage insurance premium).
   　(1) Property Approval: If the Property does not satisfy the lenders' underwriting requirements for the loan(s), this contract will terminate and the earnest money will be refunded to Buyer.
   　(2) Financing Approval: (Check one box only)
   　　☒(a) This contract is subject to Buyer being approved for the financing described in the attached Third Party Financing Condition Addendum.
   　　☐(b) This contract is not subject to Buyer being approved for financing and does not involve FHA or VA financing.
   ☐ B. ASSUMPTION: The assumption of the unpaid principal balance of one or more promissory notes described in the attached TREC Loan Assumption Addendum.
   ☐ C. SELLER FINANCING: A promissory note from Buyer to Seller of $_____, secured by vendor's and deed of trust liens, and containing the terms and conditions described in the attached TREC Seller Financing Addendum. If an owner policy of title insurance is furnished, Buyer shall furnish Seller with a mortgagee policy of title insurance.

5. **EARNEST MONEY:** Upon execution of this contract by all parties, Buyer shall deposit $ _1,000.00_ as earnest money with _Republic Title of Frisco_ as escrow agent, at _7055 Preston Rd., Frisco, Texas 75034, or leave with Ken Garia_ (address). Buyer shall deposit additional earnest money of $_____ with escrow agent within _30_ days after the effective date of this contract. If Buyer fails to deposit the earnest money as required by this contract, Buyer will be in default.

6. **TITLE POLICY AND SURVEY:**
   A. TITLE POLICY: Seller shall furnish to Buyer at ☒Seller's ☐Buyer's expense an owner policy of title insurance (Title Policy) issued by _____ (Title Company) in the amount of the Sales Price, dated at or after closing, insuring Buyer against loss under the provisions of the Title Policy, subject to the promulgated exclusions (including existing building and zoning ordinances) and the following exceptions:
   　(1) Restrictive covenants common to the platted subdivision in which the Property is located.
   　(2) The standard printed exception for standby fees, taxes and assessments.
   　(3) Liens created as part of the financing described in Paragraph 4.
   　(4) Utility easements created by the dedication deed or plat of the subdivision in which the Property is located.
   　(5) Reservations or exceptions otherwise permitted by this contract or as may be approved by Buyer in writing.
   　(6) The standard printed exception as to marital rights.
   　(7) The standard printed exception as to waters, tidelands, beaches, streams, and related matters.
   　(8) The standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements. Buyer, at Buyer's expense, may have the exception amended to read, "shortages in area".
   B. COMMITMENT: Within 20 days after the Title Company receives a copy of this contract, Seller shall furnish to Buyer a commitment for title insurance (Commitment) and, at Buyer's expense, legible copies of restrictive covenants and documents evidencing exceptions in the

Initialed for identification by Buyer ___ and Seller _KG_    TREC NO. 9-7

PLAINTIFF'S EXHIBIT 10

Commitment (Exception Documents) other than the standard printed exceptions. Seller authorizes the Title Company to deliver the Commitment and Exception Documents to Buyer at Buyer's address shown in Paragraph 21. If the Commitment and Exception Documents are not delivered to Buyer within the specified time, the time for delivery will be automatically extended up to 15 days or the Closing Date, whichever is earlier.

C. SURVEY:  The survey must be made by a registered professional land surveyor acceptable to the Title Company and Buyer's lender(s). (Check one box only)

☒ (1) Within __15__ days after the effective date of this contract, Seller shall furnish to Buyer and Title Company Seller's existing survey of the Property and a Residential Real Property Affidavit promulgated by the Texas Department of Insurance (Affidavit). If the existing survey or Affidavit is not acceptable to Title Company or Buyer's lender(s), Buyer shall obtain a new survey at ☒ Seller's ☐ Buyer's expense no later than 3 days prior to Closing Date. **If Seller fails to furnish the existing survey or Affidavit within the time prescribed, Buyer shall obtain a new survey at Seller's expense no later than 3 days prior to Closing Date.**

☐ (2) Within _____ days after the effective date of this contract, Buyer shall obtain a new survey at Buyer's expense. Buyer is deemed to receive the survey on the date of actual receipt or the date specified in this paragraph, whichever is earlier.

☐ (3) Within _____ days after the effective date of this contract, Seller, at Seller's expense shall furnish a new survey to Buyer.

D. OBJECTIONS: Buyer may object in writing to (i) defects, exceptions, or encumbrances to title: disclosed on the survey other than items 6A(1) through (7) above; or disclosed in the Commitment other than items 6A(1) through (8) above; (ii) any portion of the Property lying in a special flood hazard area (Zone V or A) as shown on the current Federal Emergency Management Agency map; or (iii) any exceptions which prohibit the following use or activity: _____

Buyer must object the earlier of (i) the Closing Date or (ii) __30__ days after Buyer receives the Commitment, Exception Documents, and the survey. Buyer's failure to object within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment are not waived. Provided Seller is not obligated to incur any expense, Seller shall cure the timely objections of Buyer or any third party lender within 15 days after Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured within such 15 day period, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer waives the objections.

E. TITLE NOTICES:

(1) ABSTRACT OR TITLE POLICY: Broker advises Buyer to have an abstract of title covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy.  If a Title Policy is furnished, the Commitment should be promptly reviewed by an attorney of Buyer's choice due to the time limitations on Buyer's right to object.

(2) PROPERTY OWNERS' ASSOCIATION MANDATORY MEMBERSHIP: The Property ☒ is ☐ is not subject to mandatory membership in a property owners' association. If the Property is subject to mandatory membership in a property owners' association, Seller notifies Buyer under §5.012, Texas Property Code, that, as a purchaser of property in the residential community identified in Paragraph 2 in which the Property is located, you are obligated to be a member of the property owners' association. Restrictive covenants governing the use and occupancy of the Property and a dedicatory instrument governing the establishment, maintenance, and operation of this residential community have been or will be recorded in the Real Property Records of the county in which the Property is located. Copies of the restrictive covenants and dedicatory instrument may be obtained from the county clerk. You are obligated to pay assessments to the property owners' association. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of the Property. **If Buyer is concerned about these matters, the TREC promulgated Addendum for Property Subject to Mandatory Membership in a Property Owners' Association should be used.**

(3) STATUTORY TAX DISTRICTS: If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Seller to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this contract.

(4) TIDE WATERS:  If the Property abuts the tidally influenced waters of the state, §33.135, Texas Natural Resources Code, requires a notice regarding coastal area property to be included in the contract.  An addendum containing the notice promulgated by TREC or required by the parties must be used.

(5) ANNEXATION: If the Property is located outside the limits of a municipality, Seller notifies Buyer under §5.011, Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to

Initialed for identification by Buyer _____ and Seller _____     TREC NO. 9-7

annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

(6) PROPERTY LOCATED IN A CERTIFICATED SERVICE AREA OF A UTILITY SERVICE PROVIDER: Notice required by §13.257, Water Code: The real property, described in Paragraph 2, that you are about to purchase may be located in a certificated water or sewer service area which is authorized by law to provide water or sewer service to the properties in the certificated area. If your property is located in a certificated area there may be special costs or charges that you will be required to pay before you can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to your property. You are advised to determine if the property is in a certificated area and contact the utility service provider to determine the cost that you will be required to pay and the period, if any, that is required to provide water or sewer service to your property. The undersigned Buyer hereby acknowledges receipt of the foregoing notice at or before the execution of a binding contract for the purchase of the real property described in Paragraph 2 or at closing of purchase of the real property.

(7) PUBLIC IMPROVEMENT DISTRICTS: If the Property is in a public improvement district, §5.014, Property Code, requires Seller to notify Buyer as follows: As a purchaser of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372, Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of your property.

(8) TEXAS AGRICULTURAL DEVELOPMENT DISTRICT: The Property ☐ is ☑ is not located in a Texas Agricultural Development District. For additional information, contact the Texas Department of Agriculture.

**7. PROPERTY CONDITION:**

A. ACCESS, INSPECTIONS AND UTILITIES: Seller shall permit Buyer and Buyer's agents access to the Property at reasonable times. Buyer may have the Property inspected by inspectors selected by Buyer and licensed by TREC or otherwise permitted by law to make inspections. Seller at Seller's expense shall turn on existing utilities for inspections.
**NOTICE**: Buyer should determine the availability of utilities to the Property suitable to satisfy Buyer's needs.

B. ACCEPTANCE OF PROPERTY CONDITION: (Check one box only)
☑ (1) Buyer accepts the Property in its present condition.
☐ (2) Buyer accepts the Property in its present condition provided Seller, at Seller's expense, shall complete the following specific repairs and treatments: _____
_____.

C. COMPLETION OF REPAIRS: Unless otherwise agreed in writing, Seller shall complete all agreed repairs prior to the Closing Date. All required permits must be obtained, and repairs must be performed by persons who are licensed or otherwise permitted by law to provide such repairs. At Buyer's election, any transferable warranties received by Seller with respect to the repairs will be transferred to Buyer at Buyer's expense. If Seller fails to complete any agreed repairs prior to the Closing Date, Buyer may do so and receive reimbursement from Seller at closing. The Closing Date will be extended up to 15 days, if necessary, to complete repairs.

D. ENVIRONMENTAL MATTERS: Buyer is advised that the presence of wetlands, toxic substances, including asbestos and wastes or other environmental hazards, or the presence of a threatened or endangered species or its habitat may affect Buyer's intended use of the Property. If Buyer is concerned about these matters, an addendum promulgated by TREC or required by the parties should be used.

E. SELLER'S DISCLOSURES: Except as otherwise disclosed in this contract, Seller has no knowledge of the following:
(1) any flooding of the Property;
(2) any pending or threatened litigation, condemnation, or special assessment affecting the Property;
(3) any environmental hazards or conditions affecting the Property;
(4) any dumpsite, landfill, or underground tanks or containers now or previously located on the Property;
(5) any wetlands, as defined by federal or state law or regulation, affecting the Property; or
(6) any threatened or endangered species or their habitat affecting the Property.

**8. BROKERS' FEES:** All obligations of the parties for payment of brokers' fees are contained in separate written agreements.

**9. CLOSING:**

  A. The closing of the sale will be on or before _November 30_, 20 _10_, or within 7 days after objections made under Paragraph 6D have been cured or waived, whichever date is later (Closing Date). If either party fails to close the sale by the Closing Date, the non-defaulting party may exercise the remedies contained in Paragraph 15.

  B. At closing:

    (1) Seller shall execute and deliver a general warranty deed conveying title to the Property to Buyer and showing no additional exceptions to those permitted in Paragraph 6 and furnish tax statements or certificates showing no delinquent taxes on the Property.

    (2) Buyer shall pay the Sales Price in good funds acceptable to the escrow agent.

    (3) Seller and Buyer shall execute and deliver any notices, statements, certificates, affidavits, releases, loan documents and other documents required of them by this contract, the Commitment or law necessary for the closing of the sale and the issuance of the Title Policy.

    (4) There will be no liens, assessments, or security interests against the Property which will not be satisfied out of the sales proceeds unless securing the payment of any loans assumed by Buyer and assumed loans will not be in default.

**10. POSSESSION:** Seller shall deliver to Buyer possession of the Property in its present or required condition upon closing and funding.

**11. SPECIAL PROVISIONS:** (Insert only factual statements and business details applicable to the sale. TREC rules prohibit licensees from adding factual statements or business details for which a contract addendum or other form has been promulgated by TREC for mandatory use.)

_The properties are free from any previous disputes with the city regarding environmental or public safety issues. The properties are ready for construction projects._

**12. SETTLEMENT AND OTHER EXPENSES:**

  A. The following expenses must be paid at or prior to closing:

    (1) Expenses payable by Seller (Seller's Expenses):

      (a) Releases of existing liens, including prepayment penalties and recording fees; release of Seller's loan liability; tax statements or certificates; preparation of deed; one-half of escrow fee; and other expenses payable by Seller under this contract.

      (b) Seller shall also pay an amount not to exceed $ _0_ to be applied in the following order: Buyer's Expenses which Buyer is prohibited from paying by FHA, VA, Texas Veterans Land Board or other governmental loan programs, and then to other Buyer's Expenses as allowed by the lender.

    (2) Expenses payable by Buyer (Buyer's Expenses):

      (a) Loan origination, discount, buy-down, and commitment fees (Loan Fees).

      (b) Appraisal fees; loan application fees; credit reports; preparation of loan documents; interest on the notes from date of disbursement to one month prior to dates of first monthly payments; recording fees; copies of easements and restrictions; mortgagee title policy with endorsements required by lender; loan-related inspection fees; photos; amortization schedules; one-half of escrow fee; all prepaid items, including required premiums for flood and hazard insurance, reserve deposits for insurance, ad valorem taxes and special governmental assessments; final compliance inspection; courier fee; repair inspection; underwriting fee; wire transfer fee; expenses incident to any loan; and other expenses payable by Buyer under this contract.

  B. Buyer shall pay Private Mortgage Insurance Premium (PMI), VA Loan Funding Fee, or FHA Mortgage Insurance Premium (MIP) as required by the lender.

  C. If any expense exceeds an amount expressly stated in this contract for such expense to be paid by a party, that party may terminate this contract unless the other party agrees to pay such excess. Buyer may not pay charges and fees expressly prohibited by FHA, VA, Texas Veterans Land Board or other governmental loan program regulations.

Initialed for identification by Buyer _____ and Seller _____      TREC NO. 9-7

**13. PRORATIONS AND ROLLBACK TAXES:**

A. PRORATIONS: Taxes for the current year, interest, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. The tax proration may be calculated taking into consideration any change in exemptions that will affect the current year's taxes. If taxes for the current year vary from the amount prorated at closing, the parties shall adjust the prorations when tax statements for the current year are available. If taxes are not paid at or prior to closing, Buyer shall pay taxes for the current year.

B. ROLLBACK TAXES: If this sale or Buyer's use of the Property after closing results in the assessment of additional taxes, penalties or interest (Assessments) for periods prior to closing, the Assessments will be the obligation of Buyer. If Seller's change in use of the Property prior to closing or denial of a special use valuation on the Property claimed by Seller results in Assessments for periods prior to closing, the Assessments will be the obligation of Seller. Obligations imposed by this paragraph will survive closing.

**14. CASUALTY LOSS:** If any part of the Property is damaged or destroyed by fire or other casualty after the effective date of this contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, but in any event by the Closing Date. If Seller fails to do so due to factors beyond Seller's control, Buyer may (a) terminate this contract and the earnest money will be refunded to Buyer (b) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (c) accept the Property in its damaged condition with an assignment of insurance proceeds and receive credit from Seller at closing in the amount of the deductible under the insurance policy. Seller's obligations under this paragraph are independent of any other obligations of Seller under this contract.

**15. DEFAULT:** If Buyer fails to comply with this contract, Buyer will be in default, and Seller may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract. If, due to factors beyond Seller's control, Seller fails within the time allowed to make any non-casualty repairs or deliver the Commitment, or survey, if required of Seller, Buyer may (a) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (b) terminate this contract as the sole remedy and receive the earnest money. If Seller fails to comply with this contract for any other reason, Seller will be in default and Buyer may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money, thereby releasing both parties from this contract.

**16. MEDIATION:** It is the policy of the State of Texas to encourage resolution of disputes through alternative dispute resolution procedures such as mediation. Any dispute between Seller and Buyer related to this contract which is not resolved through informal discussion ☐will ☒will not be submitted to a mutually acceptable mediation service or provider. The parties to the mediation shall bear the mediation costs equally. This paragraph does not preclude a party from seeking equitable relief from a court of competent jurisdiction.

**17. ATTORNEY'S FEES:** A Buyer, Seller, Listing Broker, Other Broker, or escrow agent who prevails in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding.

**18. ESCROW:**

A. ESCROW: The escrow agent is not (i) a party to this contract and does not have liability for the performance or nonperformance of any party to this contract, (ii) liable for interest on the earnest money and (iii) liable for the loss of any earnest money caused by the failure of any financial institution in which the earnest money has been deposited unless the financial institution is acting as escrow agent.

B. EXPENSES: At closing, the earnest money must be applied first to any cash down payment, then to Buyer's Expenses and any excess refunded to Buyer. If no closing occurs, escrow agent may require payment of unpaid expenses incurred on behalf of the parties and a written release of liability of escrow agent from all parties.

C. DEMAND: Upon termination of this contract, either party or the escrow agent may send a release of earnest money to each party and the parties shall execute counterparts of the release and deliver same to the escrow agent. If either party fails to execute the release, either party may make a written demand to the escrow agent for the earnest money. If only one party makes written demand for the earnest money, escrow agent shall promptly provide a copy of the demand to the other party. If escrow agent does not receive written objection to the demand from the other party within 15 days, escrow agent may disburse the earnest money to the party making demand reduced by the amount of unpaid expenses incurred on behalf of the party receiving the earnest money and escrow agent may pay the same to the creditors. If escrow agent complies with the provisions of this paragraph, each party hereby releases escrow agent from all adverse claims related to the disbursal of the earnest money.

Initialed for identification by Buyer ___ and Seller ___ TREC NO. 9-7

D. **DAMAGES:** Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent within 7 days of receipt of the request will be liable to the other party for liquidated damages in an amount equal to the sum of: (i) three times the amount of the earnest money; (ii) the earnest money; (iii) reasonable attorney's fees; and (iv) all costs of suit.

E. **NOTICES:** Escrow agent's notices will be effective when sent in compliance with Paragraph 21. Notice of objection to the demand will be deemed effective upon receipt by escrow agent.

19. **REPRESENTATIONS:** All covenants, representations and warranties in this contract survive closing. If any representation of Seller in this contract is untrue on the Closing Date, Seller will be in default. Unless expressly prohibited by written agreement, Seller may continue to show the Property and receive, negotiate and accept back up offers.

20. **FEDERAL TAX REQUIREMENTS:** If Seller is a "foreign person," as defined by applicable law, or if Seller fails to deliver an affidavit to Buyer that Seller is not a "foreign person," then Buyer shall withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. Internal Revenue Service regulations require filing written reports if currency in excess of specified amounts is received in the transaction.

21. **NOTICES:** All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile or electronic transmission as follows:

**To Buyer at:**

Inna Geyvandova

2309 Foxcreek Dr.

Richardson, TX 75082

Telephone: (972) 644-8123

Facsimile: ( )

E-mail: inna0515@aol.com

**To Seller at:**

5580 LBJ Frwy, Suite 550

Dallas, Texas 75240

Telephone: (972) 702-7435

Facsimile: (972) 702-0866

E-mail: kendal2009@sbcglobal.net

22. **AGREEMENT OF PARTIES:** This contract contains the entire agreement of the parties and cannot be changed except by their written agreement. Addenda which are a part of this contract are (check all applicable boxes):

☒ Third Party Financing Condition Addendum

☐ Seller Financing Addendum

☒ Addendum for Property Subject to Mandatory Membership in a Property Owners' Association

☐ Buyer's Temporary Residential Lease

☐ Seller's Temporary Residential Lease

☐ Other (list): _____

☐ Addendum for "Back-Up" Contract

☐ Addendum for Coastal Area Property

☐ Environmental Assessment, Threatened or Endangered Species and Wetlands Addendum

☐ Addendum for Property Located Seaward of the Gulf Intracoastal Waterway

☐ Addendum for Sale of Other Property by Buyer

**23. TERMINATION OPTION:** For nominal consideration, the receipt of which is hereby acknowledged by Seller, and Buyer's agreement to pay Seller $_____ (Option Fee) within 2 days after the effective date of this contract, Seller grants Buyer the unrestricted right to terminate this contract by giving notice of termination to Seller within _____ days after the effective date of this contract. If no dollar amount is stated as the Option Fee or if Buyer fails to pay the Option Fee to Seller within the time prescribed, this paragraph will not be a part of this contract and Buyer shall not have the unrestricted right to terminate this contract. If Buyer gives notice of termination within the time prescribed, the Option Fee will not be refunded; however, any earnest money will be refunded to Buyer. The Option Fee ☐will ☐will not be credited to the Sales Price at closing. **Time is of the essence for this paragraph and strict compliance with the time for performance is required.**

**24. CONSULT AN ATTORNEY:** Real estate licensees cannot give legal advice. READ THIS CONTRACT CAREFULLY. If you do not understand the effect of this contract, consult an attorney BEFORE signing.

Buyer's Attorney is: _____

Seller's Attorney is: _____

Telephone: (___) _____

Telephone: (___) _____

Facsimile: (___) _____

Facsimile: (___) _____

E-mail: _____

E-mail: _____

EXECUTED the __*01*__ day of __*October*__, 20_*10*_ (EFFECTIVE DATE).
(BROKER: FILL IN THE DATE OF FINAL ACCEPTANCE.)

Buyer _____

Seller _____

Buyer _____

Seller _____

The form of this contract has been approved by the Texas Real Estate Commission. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC NO. 9-7. This form replaces TREC NO. 9-6.

TREC NO. 9-7



EQUAL HOUSING OPPORTUNITY

PROMULGATED BY THE TEXAS REAL ESTATE COMMISSION (TREC)

# THIRD PARTY FINANCING CONDITION ADDENDUM

TO CONTRACT CONCERNING THE PROPERTY AT

*2000 and 2004 St. Pierre, Carrollton, Tx 75006*

(Street Address and City)

Buyer shall apply promptly for all financing described below and make every reasonable effort to obtain approval for the financing (Financing Approval). Buyer shall furnish all information and documents required by lender for Financing Approval. Financing Approval will be deemed to have been obtained when (1) the terms of the loan(s) described below are available and (2) lender determines that Buyer has satisfied all of lender's financial requirements (those items relating to Buyer's assets, income and credit history). If Buyer cannot obtain Financing Approval, Buyer may give written notice to Seller within **30** days after the effective date of this contract and this contract will terminate and the earnest money will be refunded to Buyer. **If Buyer does not give such notice within the time required, this contract will no longer be subject to Financing Approval. Time is of the essence for this paragraph and strict compliance with the time for performance is required.**

*NOTE: Financing Approval does not include approval of lender's underwriting requirements for the Property, as specified in Paragraph 4.A.(1) of the contract.*

Each note must be secured by vendor's and deed of trust liens.

**CHECK APPLICABLE BOXES:**

☒ A. CONVENTIONAL FINANCING:

   ☒ (1) A first mortgage loan in the principal amount of $ __144,000.00__ (excluding any financed PMI premium), due in full in __5__ year(s), with interest not to exceed __8__ % per annum for the first ____ year(s) of the loan with Loan Fees (loan origination, discount, buy-down, and commitment fees) not to exceed ____ % of the loan.

   ☐ (2) A second mortgage loan in the principal amount of $_____(excluding any financed PMI premium), due in full in _____ year(s), with interest not to exceed _____% per annum for the first _____ year(s) of the loan with Loan Fees (loan origination, discount, buy-down, and commitment fees) not to exceed _____% of the loan.

☐ B. TEXAS VETERANS LOAN: A loan(s) from the Texas Veterans Land Board of $_____ for a period in the total amount of _____years at the interest rate established by the Texas Veterans Land Board.

☐ C. FHA INSURED FINANCING: A Section _____ FHA insured loan of not less than $_____ (excluding any financed MIP), amortizable monthly for not less than _____years, with interest not to exceed _____% per annum for the first _____year(s) of the loan with Loan Fees (loan origination, discount, buy-down, and commitment fees) not to exceed _____ % of the loan. As required by HUD-FHA, if FHA valuation is unknown, *"It is expressly agreed that, notwithstanding any other provision of this contract, the purchaser (Buyer) shall not be obligated to complete the purchase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the purchaser (Buyer) has been given in accordance with HUD/FHA or VA requirements a written statement issued by the Federal Housing Commissioner, Department of Veterans Affairs, or a Direct Endorsement Lender setting forth the appraised value of the Property of not less than $_____. The purchaser (Buyer) shall have the privilege and option of proceeding with consummation of the contract without regard to the amount of the*

Initialed for identification by Buyer ⩲ Ɫ. G and Seller K.B.

TREC NO. 40-3

*2000 and 2004 St. Pierre, Carrollton, TX 75006*
(Address of Property)

appraised valuation. The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does not warrant the value or the condition of the Property. The purchaser (Buyer) should satisfy himself/herself that the price and the condition of the Property are acceptable."
NOTE: HUD 92564-CN "For Your Protection: Get a Home Inspection" must be attached to this Addendum.

☐ D. VA GUARANTEED FINANCING: A VA guaranteed loan of not less than $_____ (excluding any financed Funding Fee), amortizable monthly for not less than_____years, with interest not to exceed_____% per annum for the first _____year(s) of the loan with Loan Fees (loan origination, discount, buy-down, and commitment fees) not to exceed _____% of the loan.

VA NOTICE TO BUYER: "It is expressly agreed that, notwithstanding any other provisions of this contract, the Buyer shall not incur any penalty by forfeiture of earnest money or otherwise or be obligated to complete the purchase of the Property described herein, if the contract purchase price or cost exceeds the reasonable value of the Property established by the Department of Veterans Affairs. The Buyer shall, however, have the privilege and option of proceeding with the consummation of this contract without regard to the amount of the reasonable value established by the Department of Veterans Affairs."

If Buyer elects to complete the purchase at an amount in excess of the reasonable value established by VA, Buyer shall pay such excess amount in cash from a source which Buyer agrees to disclose to the VA and which Buyer represents will not be from borrowed funds except as approved by VA. If VA reasonable value of the Property is less than the Sales Price, Seller may reduce the Sales Price to an amount equal to the VA reasonable value and the sale will be closed at the lower Sales Price with proportionate adjustments to the down payment and the loan amount.

Buyer hereby authorizes any lender to furnish to the Seller or Buyer or their representatives information relating only to the status of Financing Approval of Buyer.

_____
Buyer

_____
Buyer

_____
Seller

_____
Seller

This form has been approved by the Texas Real Estate Commission for use with similarly approved or promulgated contract forms. Such approval relates to this form only. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC No. 40-3. This form replaces TREC No. 40-2.



# ADDENDUM FOR PROPERTY SUBJECT TO MANDATORY MEMBERSHIP IN A PROPERTY OWNERS' ASSOCIATION
### (NOT FOR USE WITH CONDOMINIUMS)
## ADDENDUM TO CONTRACT CONCERNING THE PROPERTY AT

_2000 and 2002 St. Pierre, Carrollton, Texas 75006_
(Street Address and City)

_Josey Park Estates Home Owners Association_
(Name of Property Owners' Association)

**A. SUBDIVISION INFORMATION:** "Subdivision Information" means: (i) the restrictions applying to the subdivision, (ii) the bylaws and rules of the Property Owners' Association (Association), and (iii) a resale certificate, all of which comply with Section 207.003 of the Texas Property Code. (Check only one box):

☒ 1. Within _30_ days after the effective date of the contract, Seller shall at Seller's expense deliver the Subdivision Information to Buyer. If Buyer does not receive the Subdivision Information, Buyer may terminate the contract at any time prior to closing and the earnest money will be refunded to Buyer. If Seller delivers the Subdivision Information, Buyer may terminate the contract for any reason within 7 days after Buyer receives the Subdivision Information or prior to closing, whichever first occurs, and the earnest money will be refunded to Buyer.

☐ 2. Buyer has received and approved the Subdivision Information before signing the contract.

☐ 3. Buyer does not require delivery of the Subdivision Information.

If Seller becomes aware of any material changes in the Subdivision Information, Seller shall promptly give notice to Buyer. Buyer may terminate the contract prior to closing by giving written notice to Seller if: (i) any of the Subdivision Information provided was not true; or (ii) any material adverse change in the Subdivision Information occurs prior to closing, and the earnest money will be refunded to Buyer.

**B. FEES:** Buyer shall pay any Association fees resulting from the transfer of the Property not to exceed $ _300.00_ and Seller shall pay any excess.

**NOTICE TO BUYER REGARDING REPAIRS BY THE ASSOCIATION:** The Association may have the sole responsibility to make certain repairs to the Property. If you are concerned about the condition of any part of the Property which the Association is required to repair, you should not sign the contract unless you are satisfied that the Association will make the desired repairs.

_____          _____
Buyer                                Seller

_____          _____
Buyer                                Seller

The form of this addendum has been approved by the Texas Real Estate Commission for use only with similarly approved or promulgated forms of contracts. Such approval relates to this contract form only. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC No. 36-5. This form replaces TREC No. 36-4.

**Approved by the Texas Real Estate Commission for Voluntary Use**

*Texas law requires all real estate licensees to give the following information
about brokerage services to prospective buyers, tenants, sellers and landlords.*

# Information About Brokerage Services

**B**efore working with a real estate broker, you should know that the duties of a broker depend on whom the broker represents. If you are a prospective seller or landlord (owner) or a prospective buyer or tenant (buyer), you should know that the broker who lists the property for sale or lease is the owner's agent. A broker who acts as a subagent represents the owner in cooperation with the listing broker. A broker who acts as a buyer's agent represents the buyer. A broker may act as an intermediary between the parties if the parties consent in writing. A broker can assist you in locating a property, preparing a contract or lease, or obtaining financing without representing you. A broker is obligated by law to treat you honestly.

## IF THE BROKER REPRESENTS THE OWNER:

The broker becomes the owner's agent by entering into an agreement with the owner, usually through a written - listing agreement, or by agreeing to act as a subagent by accepting an offer of subagency from the listing broker. A subagent may work in a different real estate office. A listing broker or subagent can assist the buyer but does not represent the buyer and must place the interests of the owner first. The buyer should not tell the owner's agent anything the buyer would not want the owner to know because an owner's agent must disclose to the owner any material information known to the agent.

## IF THE BROKER REPRESENTS THE BUYER:

The broker becomes the buyer's agent by entering into an agreement to represent the buyer, usually through a written buyer representation agreement. A buyer's agent can assist the owner but does not represent the owner and must place the interests of the buyer first. The owner should not tell a buyer's agent anything the owner would not want the buyer to know because a buyer's agent must disclose to the buyer any material information known to the agent.

## IF THE BROKER ACTS AS AN INTERMEDIARY:

A broker may act as an intermediary between the parties if the broker complies with The Texas Real Estate License Act. The broker must obtain the written consent of each party to the transaction to act as an intermediary. The written consent must state who will pay the broker and, in conspicuous bold or underlined print, set forth the broker's obligations as an intermediary. The broker is required to treat each party honestly and fairly and to comply with The Texas Real Estate License Act. A broker who acts as an intermediary in a transaction:

    (1) shall treat all parties honestly;

    (2) may not disclose that the owner will accept a price less than the asking price unless authorized in writing to do so by the owner;

    (3) may not disclose that the buyer will pay a price greater than the price submitted in a written offer unless authorized in writing to do so by the buyer; and

    (4) may not disclose any confidential information or any information that a party specifically instructs the broker in writing not to disclose unless authorized in writing to disclose the information or required to do so by The Texas Real Estate License Act or a court order or if the information materially relates to the condition of the property.

With the parties' consent, a broker acting as an intermediary between the parties may appoint a person who is licensed under The Texas Real Estate License Act and associated with the broker to communicate with and carry out instructions of one party and another person who is licensed under that Act and associated with the broker to communicate with and carry out instructions of the other party.

## If you choose to have a broker represent you,

you should enter into a written agreement with the broker that clearly establishes the broker's obligations and your obligations. The agreement should state how and by whom the broker will be paid. You have the right to choose the type of representation, if any, you wish to receive. Your payment of a fee to a broker does not necessarily establish that the broker represents you. If you have any questions regarding the duties and responsibilities of the broker, you should resolve those questions before proceeding.

---

Real estate licensee asks that you acknowledge receipt of this information about brokerage services for the licensee's records.

X _____       10/01/2010

Buyer, Seller, Landlord or Tenant      Date

Texas Real Estate Brokers and Salespersons are licensed and regulated by the Texas Real Estate Commission (TREC). If you have a question or complaint regarding a real estate licensee, you should contact TREC at P.O. Box 12188, Austin, Texas 78711-2188 or 512-465-3960.



**01A**     TREC No. OP-K

INNA GEVANDOV
2903 FOX CREEK DRIVE          10-97
RICHARDSON, TX 75082

Pay to the
Order of _Republic Title or Ken Gazian_____ | $ 1,000 00/100

DATE __10.8.10__          2296
                          32-75/1110
                          783

One thousand   00/100 _____ DOLLARS

ComericA Bank
Comerica Bank
Dallas, Texas
www.comerica.com

Platinum Circle

For _2002 and 2004 St Pierre_

⑈111000753⑈ 700109119311⑈ 02296

MP

D

## TABLE OF ARTICLES

1. The Contract Document

2. The Work of This Contract

3. Relationship of the Parties

4. Date of Commencement and Substantial Completion

5. Time

6. Contract Sum and Guaranteed Price

7. Payments

8. Changes in the Work

9. Extent of Contractor's Responsibility

10. Extent of Owner's Responsibility

11. Miscellaneous Provisions

12. Termination of the Contract by the Contractor

13. Termination of the Contract by the Owner



PLAINTIFF'S EXHIBIT

11

PENGAD - Bayonne, N. J.

# GEHARD LUXURY HOMES
## Standard Form of Agreement Between Owner and Contractor

**AGREEMENT** made as of the 12 day of October in the year of 2010.

**BETWEEN** the Owner: INNA GEYVANDOVA

And the Contractor: PIERRE INVESTMENTS, INC / GEHARD Luxury Homes

**The Project is:**
(Name, address and brief description) 2000 AND 2004 SAINT PIERRE, CARROLLTON, TX 75006

Also known as Lot 17R & 18R, Block A, Subdivision JOSEY PARK ESTATES

Addition to the city of Carrollton, DALLAS County, Texas, as recorded in Volume 2004019, Page 30, Map Records, Dallas County, Texas

**The Architect/Designer is:**

The OWNER and the CONTRACTOR agree as set forth below:

## ARTICLE 1
## THE CONTRACT DOCUMENTS

1.1  The Contract Documents consist of this Agreement signed by the Owner and Contractor, the Specifications, Drawings, Addenda issued prior to execution of this Agreement, written Change Orders or orders for minor changes in the Work issued after execution of this Agreement, and other documents, if any, listed in this Agreement. These form the Contract, and are all as fully a part of the Contract as if attached to this Agreement of repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral.

## ARTICLE 2
## THE WORK OF THIS CONTRACT

2.1  The Contractor shall execute the entire work described in the Contract Documents for the construction of a single-family residences located at 2000 Saint Pierre and 2004 Saint Pierre, Carrollton, Texas, 75006, DALLAS County, Texas, except to the extent specifically indicated in the Contract Documents to be the responsibility of others, and described in Article 10.

✳ *2004 St. Pierre to begin after the sale off 2000 St. Pierre*
*I.G.*
*K.G.*

## ARTICLE 3
## RELATIONSHIP OF THE PARTIES

3.1  The Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interest of the Owner; to furnish efficient business administration and superintendence; to use the best efforts to furnish at all time an adequate supply of workers and materials; and to perform the Work in the most expeditious and economical manner consistent with the interests of the Owner.

GEHARD® LUXURY HOMES

DOCUMENT GLH 1-2002

OWNER-CONTRACTOR AGREEMENT

P.O. Box 852832
Richardson, Tx 75085-2832

*K.G.*
*I.G.*
1

The Owner agrees to furnish or approve, in a timely manner, information required by the Contractor as described in Article 10, and to make payments to the Contractor in accordance with the requirements of the Contract Documents, as described in Article 7.

## ARTICLE 4
## DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4.1     The date of commencement of the Work shall be the date of this Agreement, unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner: ＊ *One house at a time* ~~ZG~~

As soon as completing the lots purchase and the interim construction funds are available.

If, prior to commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

NOT TO EXCEED THIRTY (30) DAYS.

4.2     The Contractor shall achieve **Substantial Completion of the entire Work not later than Twelve (12) Months from the date of commencement, subject to adjustments of this Contract Time as provided in the Contract Documents, and described in Article 5.

**      Substantial Completion is defined as issuance of a "Building Final" by the City of Carrollton, or Owner's occupancy or utilization the Work for its intended use, whichever comes first.

## ARTICLE 5
## TIME

5.1     The Contract Time shall be measured from the date of commencement.

5.2     Time limits stated in the Contact Documents are of the essence of the Contract.

5.3     If the contract is delayed at any time in progress of the Work by changes ordered in the Work, as or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, the Contract Time shall be extended by Change Order for such reasonable time as the Owner may determine.

## ARTICLE 6
## CONTRACT SUM AND GUARANTEED MAXIMUM PRICE

6.1     The Contract Sum in the Agreement is the total Cost of the Work and the Contractor's Fee payable by the Owner to the Contractor for performance of the Work under the Contract Documents, and is guaranteed by the Contractor not to exceed the amount indicated in Paragraph 6.2. This maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price.

6.2     The Owner agrees to pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The agreed Contract Sum is THREE HUNDRED SEVENTY- FIVE THIUSAND and 00/100 DOLLARS ($375,000), including the land cost, but subject to additions and deductions as provided in the Contract Documents.

6.3     The Contract Sum and Contract Time as described in Article 5 shall be subject to equitable adjustment if concealed or unknown physical conditions are encountered at the site that differ materially from those indicated in the Contract Documents or from those conditions ordinarily found to exist.



GEHARD
LUXURY HOMES

DOCUMENT GLH 01-2002

OWNER-CONTRACTOR
AGREEMENT

P.O. Box 852832
Richardson, Tx 75085-2832

## ARTICLE 7
## PAYMENTS

**7.1** The Owner payments to the Contractor for the Contract Sum shall be made immediately, following Contractor's receipt of an itemized request stating the Cost of Work, which draw requests shall be submitted by Contractor to Owner no more than (7) per month.

**7.2** In the event any payment is not made when due, contractor may stop construction activity until payment is made and for five (5) days thereafter. In the event any payment is not made within ten (10) days after it is due, Contractor may take such action as may be necessary, including legal proceedings, to enforce its rights here under.

**7.3** Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate of 3%, or in the absence thereof, at the legal rate prevailing from time to time at the place of the Project is located.

**7.4** The Owner's final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when the Contract has been fully performed by the Contractor; such final payment shall be made by the Owner not more than 15 days after the Substantial Completion described in Paragraph 4.2.

**7.5** Owner shall not have possession of the structure until such time as the payment described in Article 6 has been fully made or performed by the Owner. If possession of structure is taken by Owner before the above obligations are met, without the written consent of Contractor, it shall be considered as acceptance of the structure, by the owner, as complete and satisfactory.

## ARTICLE 8
## CHANGES IN THE WORK

**8.1** From time to time after execution of the Contract, the Owner, without invalidating the Contract may order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions accomplished by Change Order Request; the Contract Sum and Contract Time being adjusted accordingly.

**8.2** A Change Order Request shall be a written order to the Contractor signed by the Owner and Architect to change the Work, Contract Sum or Contract Time.

## ARTICLE 9
## EXTENT OF CONTRACTOR'S RESPONSIBILITY

**9.1** The Contractor agrees to exercise reasonable skill and judgment in the preparation of schedules and estimates, and guarantees all specified line items within in the schedule, approved by the Owner. The recommendations and advice of the Contractor concerning design alternatives shall be subject to the review and approval of the Owner. It is not the Contractor responsibility to ascertain that the Drawings and Specifications and in accordance with applicable laws, statutes, ordinances, building codes, rules and regulations. However, if the Contractor recognizes that portions of the Drawings and Specifications are at variance, the Contractor shall promptly notify the Owner and/or Architect.

**9.2** The Contractor shall consult with the owner and Architect regarding site use and improvements, and the selection of materials and building systems. The Contractor shall provide recommendations on construction feasibility; time requirements for construction completion; and factors related to construction cost including estimates of alternative designs or materials, preliminary budgets and possible economies.

**9.3** When the Owner has sufficiently identified the Project requirements and the Architect has prepared other basic design criteria, the Contractor shall prepare, for the approval of the Owner, a preliminary cost estimate utilizing area, volume or similar conceptual estimating techniques. If any estimate submitted to the Owner exceeds previously approved estimates or the Owner's budget, the Contractor shall make appropriate recommendations to the Owner and Architect.

GEHARD
LUXURY HOMES

DOCUMENT GLH H-2002

OWNER-CONTRACTOR
AGREEMENT

P.O. Box 852832
Richardson, Tx 75085-2832



**9.4** The Contractor shall meet with the Owner to review the Proposal. In the event that the Owner discover any inconsistencies or inaccuracies in the information presented, the Owner shall promptly notify the Contractor, who shall make appropriate adjustments to the Proposal. When the Proposal is acceptable, the Owner shall approve by signing.

**9.5** Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time.

**9.6** Contractor shall not be responsible for damages to persons or property occasioned by Owner or his agents, third parties or other causes beyond contractor's control. Owner shall hold contractor completely harmless from, and shall indemnify contractor for, all costs, damages, losses, and expenses, including judgments and attorneys fees, resulting from claims arising from causes enumerated in this paragraph.

## ARTICLE 10
## EXTENT OF OWNER'S RESPONSIBILITY

**10.1** The Owner shall furnish evidence of Project financing prior to the start of the Construction and from time to time thereafter as the Contractor may request. Furnishing of such evidence shall be a condition precedent to commencement or continuation of the Work.

**10.2** The Owner shall establish and update an overall budget for the Project, based on consultation with Contractor, which shall include contingencies for changes in the Work and other costs, which are the responsibility of the Owner.

**10.3** The Owner shall furnish free of charge 8 copies of the Drawings, and as many additional copies as the Contractor may require.

**10.4** The Owner shall furnish the Surveys and Tests concerning the conditions of the site, which are required by law, following with reasonable promptness and the Owner's expense.
The surveys and legal information shall include adjacent drainage; restrictions, easements, deed restrictions and contours of the site. All information on the survey shall be referenced to a project benchmark. The services of a geotechnical engineer, when such services are requested by the Contractor, may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, ground corrosion and resistance tests, including necessary operations for anticipating subsoil conditions, with reports and appropriate professional recommendations. The Contractor shall be entitled to rely upon the accuracy of any such information, reports, surveys, drawings and tests described herein.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

**11.1** Terms used in this agreement, which are defined in the Contract Documents, shall have the meanings designated in those Contract Documents.

**11.2** All Work required to be done by the Contractor hereunder shall be done in accordance with the Drawings furnished to the Contractor by the Owner. It is understood that Owner believes it has employed competent engineers, designers and architects. Owner alone shall be responsible for the adequacy of design, sufficiency of the Contract Documents, the safety of the structure and the practicability of the Contractor to make certain that the Documents are in accordance with applicable laws, statutes building codes and regulations. The Contractor will not be liable or in any way responsible for work done in accordance with the Drawings and Specifications supplied by and/or approved by the Owner, and the Contractor makes no express or implied warranty (including merchantability, fitness or a particular purpose, habitability, and workmanlike construction), and there are no oral agreements, representations and conditions except as expressly stated herein or in the Contract Documents.

**11.3** Claims, disputes or other matters in question between the parties to this Agreement shall be resolved by mediation or by arbitration, rather than through litigation. Prior to arbitration, the parties shall endeavor to reach settlement by mediation.



GEHARD
LUXURY HOMES

DOCUMENT GLH 01-2002

OWNER-CONTRACTOR
AGREEMENT

P.O. Box 852832
Richardson, Tx 75085-2832




4

## ARTICLE 12
## TERMINATION OF THE CONTRACT BY THE CONTRACTOR

**12.1** If the Owner fails to make payments as defined in Article 7, the Contractor may terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials and labor, including reasonable overhead, profit and damages.

**12.2** In the event Contractor cannot obtain a building permit within thirty (30) days of the date of this agreement, contractor may declare the Agreement of no further force or effect.

## ARTICLE 13
## TERMINATION OF THE CONTRACT BY THE OWNER

**13.1** The Owner may terminate the Contract if the Contractor:

**.1** persistently or repeatedly refuses or fails to supply enough properly skilled workers and materials;

**.2** fails to make payments to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

**.3** persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction;

This Agreement is entered as of the day and year first written above and is executed in at least two original copies, of which one is to be given to the Owner, and the other to the Contractor.

**OWNER** *(Signature)*

_Inng Gevandov_
*(Printed name)*

**CONTRACTOR** *(Signature)*

PIERRE INVESTMENTS, INC. / Gehard Luxury Homes
*(Printed name and title)*



DOCUMENT GLH 1-2002

OWNER-CONTRACTOR
AGREEMENT

P.O. Box 852832
Richardson, Tx 75085-2832

5

E



PROMULGATED BY THE TEXAS REAL ESTATE COMMISSION (TREC)

# NOTICE OF BUYER'S TERMINATION OF CONTRACT

CONCERNING THE CONTRACT FOR THE SALE OF THE PROPERTY AT

2000 and 2004 St. Pierre, Carrollton, TX 75044

(Street Address and City)

BETWEEN THE UNDERSIGNED BUYER AND    Pierre Investments, Inc.

(SELLER)

Buyer notifies Seller that the contract is terminated pursuant to the following:

☑ (1)  the unrestricted right of Buyer to terminate the contract under Paragraph 23 of the contract.

☐ (2)  Buyer cannot obtain Financing Approval in accordance with the Third Party Financing Condition Addendum to the contract.

☐ (3)  the Property does not satisfy the lenders' underwriting requirements for the loan under Paragraph 4A(1) of the contract.

☐ (4)  Buyer elects to terminate under Paragraph A of the Addendum for Property Subject to Mandatory Membership in a Property Owners' Association.

☐ (5)  Buyer elects to terminate under Paragraph 7B(2) of the contract relating to the Seller's Disclosure Notice.

☑ (6)  Other (identify the paragraph number of contract or the addendum): _____
Unexpected dumping activities

NOTE: Release of the earnest money is governed by the terms of the contract.

_____        11.01.10        _____
Buyer                            Date      Buyer                        Date

This form has been approved by the Texas Real Estate Commission for use with similarly approved or promulgated contract forms. Such approval relates to this form only. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not suitable for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC No. 38-2. This form replaces TREC No. 38-1.

PLAINTIFF'S
EXHIBIT
15
PENGAD-Bayonne, N.J.

TREC No. 38-2

Inna Geyvandova
2309 Foxcreek Dr.
Richardson, TX 75082


February 21, 2011


Pierre Investments, Inc.
5580 LBJ Freeway, Suite 550
Dallas, TX 75240


RE:  Purchase Contract for 2000 and 2004 Saint Pierre


To Whom It May Concern:

As per your request, I am letting you or anyone in your firm know that our contract dated October 01, 2010, pertaining to properties located at 2000 and 2004 St. Pierre in Carrollton, was terminated due to unexpected dumping activities discovered upon my last visit to the site. I was not interested in carrying forward the responsibilities of potential environmental claims to deal with after the closing. Sorry that I walked away from the properties and the house construction, but I also didn't have time nor could I afford any clean-up disputes, environmental charges, or assessments.

Regards,

Inna Geyvandova
2309 Foxcreek Drive
Plano, TX 75082

April 30, 2011

Pierre Investments, Inc.
5580 LBJ Freeway, Suite 550
Dallas, TX 75240

RE: Land Purchase Contract for 2000 and 2004 Saint Pierre and Construction

To Whom It May Concern:

As I already stated earlier in my letter, I am confirming to you or anyone in your firm that our Land Purchase Contract dated October 01, 2010, pertaining to the properties listed above, was terminated due to unexpected dumping activities discovered upon my site visit. I was explained of all previous environmental issues on these properties and was promised that such issues have already been resolved, and believed that the properties were clean and ready for construction right after closing. However, it didn't appear so upon my last visit to the property, where I discovered several piles of unknown materials being dumped onto the site by construction trucks. I never anticipated nor agreed for being engaged in your continuous environmental responsibilities. I didn't have time nor could I afford the continuous clean-up disputes, environmental charges or assessments, and therefore, I decided to walk away from purchasing any of these properties and/or continue on with my anticipated construction project.

Regards,

Inna Geyvandova

IN WITNESS WHEREOF the undersigned have executed this Affidavit as of the Effective Date.

STATE OF TEXAS §
§
COUNTY OF Dallas §

This instrument was acknowledged before me this 30 day of April, 2011, by Ms. Inna Geyvandova



DON W. PHARR
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 5/22/2012

_____
NOTARY PUBLIC in and for the State of Texas

F

Q      Per?

A      Per lot.

Q      So how much did you pay to the closing -- sorry, the title company?

A      I paid 74 something.  $74,500.

Q      Is this a copy of the check, cashier's check?

A      Right.

Q      What was the price that you paid for the liens?

A      My mistake.  $73,500.

Q      Were you ultimately damaged as a result of the dumps?

A      I lost two my contracts for sale of the lots.  I lost my two contracts to build two homes.  I paid extra 10 percent on the city liens that they assessed the properties.  I paid taxes.  I paid homeowners association dues.  Everything that I had to hold on to the lots, try to find another seller -- another buyer who will not only buy the land, but give me the opportunity to build because I'm a builder.  I'm not in flipping properties.

Q      Now, you stated that you want to itemize your damages here.  So there was -- the contract with your sister was for how much?

A        Contract for sale of the land?

Q        Yes.

A        $160,000.

Q        How much was the contract for the sale of the lots with Mr. Fabian?

A        $84,000.

Q        So is that a difference of $76,000?

A        If that's what you have, yes.

Q        Now, you also stated that you lost the sale on the -- the profit for the construction of the homes?

A        Yes, correct.

Q        Now, what was your total profit for that, your profit you would have made?

A        My normal profit or discount to Inna?

Q        Yes, for Inna.

A        For Inna, my profit would have been $75,000 for each house.

Q        And how did you come to calculate the 75?

A        Simple.  It's -- I profit 55 -- I profit 30, but I discounted to Inna to $25 per square foot. That's 3,000 square foot -- I normally profit $30 per square foot.  I discounted to Inna $25 per square foot in the construction times 3,000 square feet times two homes.  That's $75,000 times two.  That's

$150,000.

Q    Now, the 3,000, is that the -- was that the contract?  Is that what you're anticipating building a 3,000 square foot home?

A    I think so.  It's even in the contract.

Q    Did you have any other expenses involving the upkeep and maintenance of the lots for the two years?

A    Small stuff.  Mowing grass, homeowners association.  I paid taxes to the City of Carrollton, taxes to the independent school district.

Q    Now you stated that one of the -- were there any liens that had to be paid during this time, any interest on those liens?

A    10 percent interest per year, yes.

Q    And do you have any -- did you receive any statements from the City of Carrollton regarding these liens?

A    Sure.

MR. MUSGROVE:  At this time, Your Honor, I would like to offer Exhibit 24 into evidence?

THE COURT:  24 is already admitted.

Q    (By Mr. Musgrove) Ken, what is this -- what is this picture?  What is this document?